UNITED STATES of America, Plaintiff–Appellee,

v.

David J. PAYNE, Defendant–Appellant.

No. 89–10277.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 1990.

Decided Sept. 6, 1991.

---

A.J. Kramer, Chief Asst. Federal Defender, Sacramento, Cal., for defendant-appellant.

Richard J. Bender, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before CHOY and FLETCHER, Circuit Judges, and JAMES M. FITZGERALD, District Judge.*

FLETCHER, Circuit Judge:

David Payne appeals his conviction, following a jury trial, on four counts of carnal knowledge of a female under age 16. Payne challenges his conviction on numerous grounds. Specifically, Payne argues that the district court committed reversible

* Honorable James M. Fitzgerald, Senior District Judge for the District of Arizona, sitting by designation.

error when it failed to instruct the sworn jury on the presumption of innocence; excluded evidence of other sexual acts of the victim; admitted prior consistent statements by the victim; admitted certain hearsay statements by the victim and by her foster mother; and admitted into evidence a medical report. Payne also argues that the voir dire was inadequate; that the district judge should have recused himself; and that the judge's conduct in the case was improper. We conclude that these many contentions are without merit and therefore affirm the conviction.

## BACKGROUND

Defendant/appellant David Payne was indicted on January 4, 1988, in the Eastern District of California in an eleven count indictment which charged various acts of child molestation. Counts 1 through 4, of which Payne was ultimately convicted, alleged violations of 18 U.S.C. § 2032, carnal knowledge of a female under 16, Payne's 12–year old foster daughter.[1]

David Payne and his wife, Tonda, had five foster children. Among these children were Margaret (the victim) and her brother Andrew. They lived with the Paynes from March 14 to June 8, 1984. At trial Margaret was the government's principal witness. She testified that Payne began molesting her three to four weeks after she arrived at the Paynes', and that the incidents continued throughout her three-month stay. Margaret testified to particular incidents that she was able to remember because they occurred at unusual times or places.

Margaret testified that her brother Andrew had a notebook in which he wrote that he had seen Payne come in and out of her room. Margaret stated that she tore up this page and chased her brother, and beat him up. Andrew also testified and corroborated this incident. Margaret stated that she did not tell anyone about the abuse at the time because she felt she needed love and attention and didn't want

to hurt Tonda, Payne's wife, or lose her friendship.

Margaret left the Paynes' home in June, 1984, and went to live with a new foster mother, Jackie Blondell. Margaret testified that the first time she told anyone about the molestation was in January 1985, when she was living at the Blondells' home. She stated that several teen-age girls were sitting downstairs at the Blondells' sharing their experiences of sexual abuse when she (Margaret) became upset and went upstairs. Margaret testified that she called Sha (one of the other girls) upstairs and told her that she had been abused by David Payne. Margaret testified that she made Sha promise not to tell anyone, but that Sha ran out of the room and told Jackie Blondell.

Dr. Hal Meadows also testified, based on an examination of Margaret nine months after she had left the Paynes', that the condition of her vagina was consistent with multiple episodes of sexual intercourse. Jackie Blondell, Margaret's second foster mother, also testified for the government.

After a seven-day jury trial and after three days of jury deliberations, Payne was convicted of four counts of carnal knowledge against Margaret. He was sentenced to three years on each count consecutively (12 years total). This appeal followed.

## DISCUSSION

### A. *Presumption of Innocence Instruction*

Payne argues that the district court committed reversible error when it failed to instruct on the presumption of innocence after the jury was sworn. During the jury selection process, the court mentioned the presumption of innocence on three occasions. After reading the charges to the venire, the court stated: "Also, I instruct you that the defendant is presumed innocent and that presumption of innocence remains with him throughout the trial and

---

1. The other counts alleging assault and attempted molestation of a foster child named Roger were dismissed prior to trial. Of the four remaining counts alleging molestation of a third

foster child named Heather, one was dismissed by the government during trial and three were dismissed by the government after the jury hung on those counts.

during your deliberations until it is dispelled by proof of guilt beyond a reasonable doubt." RT 56. Later on, again before the jury was sworn, the court made its second reference to the presumption of innocence instruction:

As you can see, ladies and gentleman, already in this brief span of time I've already instructed you about some legal principles that are applicable to this case. For example, that the burden of proof is on the Government to prove the charges beyond a reasonable doubt and that the defendant is presumed to be innocent. RT 60.

Finally, and also during the voir dire, the judge stated "[T]he defendant has no obligation to produce any evidence and he does not have to prove his innocence." RT 66–67. After the voir dire and the cause and peremptory challenges, the jury was sworn. RT 180. An instruction on the presumption of innocence was not included in any instructions read to the jury after it was sworn.

(1) *Standard of Review*

■ As a threshold matter, we must determine whether Payne adequately objected to the jury instructions so as to preserve this issue on appeal. When an adequate objection to jury instructions is not made, we review the jury instructions for plain error only. *United States v. Kessi,* 868 F.2d 1097, 1102 (9th Cir.1989). "A plain error is a highly prejudicial error affecting substantial rights." *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). Plain error is invoked to prevent a miscarriage of justice or to preserve the integrity and the reputation of the judicial process. *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986).

Both the government and the defense submitted proposed jury instructions. At an in-chambers discussion of jury instructions and before closing arguments, the court went over the proposed jury instruc-

tions with counsel. After settling the government's jury instructions, the court stated:

I've indicated which ones I'll give and which ones I will not give and apparently there's no further objections.

Incidentally, you will be handed a package of instructions as I intend to read them to the jury so that you can follow along as I read them because sometimes I edit as I read. At the conclusion of the reading of the instructions to the jury, I will give each side an opportunity to once again object to the instructions as read on the record. RT 1271.

The court then proceeded to consider Payne's proposed jury instructions. Jury Instruction Number 1 proposed by Payne contained the presumption of innocence instruction. The court rejected this instruction, stating: "I am not inclined to give Jury Instruction Number 1, it's redundant, that is, it's covered elsewhere." RT 1271. Payne made no objection at this point.

After the jury instructions were read, the court asked counsel if they had any objections to the jury instructions as read. Defense counsel made no objection. RT 1402.

■ Payne relies on a footnote in *United States v. Egan,* 860 F.2d 904, 907 n. 1 (9th Cir.1988) in support of his argument that his submission of a presumption of innocence instruction was sufficient to preserve the issue on appeal. However, we find *Egan* and the cases cited therein, *Brown v. Avemco Investment Corp.,* 603 F.2d 1367, 1370–72 (9th Cir.1979) and *Martinelli v. City of Beaumont,* 820 F.2d 1491, 1493–94 (9th Cir.1987), distinguishable from the present case. Those cases involved contested issues of law in which the trial court was always fully aware of the defendant's position. In *Brown,* the court explained what was necessary to constitute a sufficient objection to jury instructions under Fed.R.Civ.P. 51.[2]

---

**2.** Federal Rule of Civil Procedure 51 discussed in *Brown* is the civil analogue to Fed.R.Crim.P. 30. The standard for a proper objection under

Fed.R.Crim.P. 30 and its civil counterpart is the same. *Kessi,* 868 F.2d at 1102. Fed.R.Crim.P. 30 provides: "No party may assign as error any

In order to preserve for appeal an objection to a jury instruction, thus, it is not necessary for a party to except or object "if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing."

*Brown,* 603 F.2d at 1370 (citation omitted).

More recently, we have held that only where an objection would be a "pointless formality" will we dispense with the requirement of a formal, timely, and distinctly-stated objection. *Kessi,* 868 F.2d at 1102. In *Kessi,* we stated that an objection may be a "pointless formality" when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction. *Id.* (citing *Martinelli,* 820 F.2d at 1493–94; *Brown,* 603 F.2d at 1371–73).

In the case at bar, there is no doubt that a specific objection from defense counsel would not have been a "pointless formality" and would have corrected the error, since it is clear from the record that the omitted instruction was simply due to judicial oversight.[3] Therefore, the rationale of *Egan* and the cases cited therein is inapplicable to the present case and we review only for plain error.

## (2) *Case-by-case approach*

█ Payne urges us to follow *United States v. Dilg,* 700 F.2d 620 (11th Cir.1983), which he asserts is factually apposite and which he reads as creating some kind of "bright line" rule that giving a presumption of innocence instruction only prior to jury impanelment constitutes reversible error.[4] Such a reading is inconsistent with the Supreme Court's holdings in *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) and *Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (per curiam), with Ninth Circuit precedent, *see United States v. Witt,* 648 F.2d 608, 611 (9th Cir.1981), and with the approach of *Dilg* itself, all of which make clear that analysis of whether ill-timing or omission of a presumption of innocence instruction constitutes reversible error must be based on the individual circumstances of the particular case.

In *Taylor v. Kentucky,* the Supreme Court held on the facts that the state trial court's refusal to give petitioner's requested instruction on the presumption of innocence resulted in a violation of his right to a fair trial. 436 U.S. at 490, 98 S.Ct. at 1937. "[T]he combination of the skeletal instructions, the possible harmful inferences from the [prosecutor's] references to the indictment, and the repeated suggestions that petitioner's status as a defendant tended to establish his guilt created a genuine danger that the jury would convict petition-

portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." The policy behind this rule is to prevent unnecessary new trials caused by errors in instructions that the district court easily could have corrected if they had been brought to its attention at the proper time.

**3.** The district judge indicated clearly that the omission of the presumption of innocence instruction was due to oversight:

[A]fter I read the instructions to the jury, at the conclusion of counsel's summation, I asked each of counsel if they had any objections to the instructions as I read them to the jury. Each defendant's counsel said no on the record and in open court at that time they did not point out that anything in connection with the presumption of innocence or the quantum

of proof had been omitted. As I've indicated, apparently it was prosecutorial oversight that that portion was deleted from the final instruction given to the jury. RT 1443.

**4.** We note as an initial matter that the court in *Dilg* considered the issue under a different standard of review. The trial court in *Dilg* had refused to give a presumption of innocence instruction despite a clear request and objection by the defendant, and the defendant complained on appeal of "a violation of federal rules and procedure." Thus, the *Dilg* court was "asked [only] to exercise [its] supervisory power over the lower federal courts. . . ." 700 F.2d at 623. Indeed, *Dilg* itself specifically distinguished cases such as *Taylor* and *Whorton, infra,* in which an error must rise to the level of a federal constitutional violation before relief is warranted, and cases such as the present one, in which we review only for plain error. *Id.*

er on the basis of those extraneous considerations...." *Id.* at 487–88, 98 S.Ct. at 1935–36. Against that backdrop, the Court held that it was error for the trial court to refuse the defendant's proffered presumption of innocence instruction.

The Court noted, however, that "an instruction on the presumption is [only] one way of impressing upon the jury the importance of ... [the defendant's right] to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody or other circumstances not adduced at trial." *Id.* at 485, 98 S.Ct. at 1935. It likewise stated that the "use of the particular phrase 'presumption of innocence'—or any other form of words—may not be constitutionally mandated." *Id.* The Court explained that the dual purpose of a presumption of innocence instruction is to reinforce the "requirements of finding guilt [1] only on the basis of the evidence and [2] beyond a reasonable doubt." *Id.* at 486, n. 13, 98 S.Ct. at 1935, n. 13 (citing *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976)).

The following term, in *Whorton*, 441 U.S. at 789, 99 S.Ct. at 2089–90, the Court explicitly limited *Taylor* to its facts and made clear that

> the failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution.... [S]uch a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence

was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial. While the Supreme Court in *Whorton* addressed claims of constitutional error which had been brought on direct appeal from a state court, its analysis is nevertheless applicable to the case at hand, where we review only for plain error.[5] The Court held that even a complete failure of a trial judge to give a presumption of innocence instruction may not be of constitutional magnitude and may amount to harmless error. *See Whorton*, 441 U.S. at 787, 99 S.Ct. at 2088–89 (expressly reversing the Kentucky Supreme Court's holding that a failure to give a presumption of innocence instruction was reversible error *per se* under *Taylor*). In *Witt*, 648 F.2d at 611 (defendant contested the *adequacy* of the presumption of innocence instruction given by the court), this court, citing *Taylor* and *Whorton*, likewise recognized that "[a]lthough in some cases a jury should be made aware of the presumption [of innocence], an instruction is not required in all cases." (citations omitted)

Since both the Supreme Court and this circuit have recognized that it may be harmless error for a trial court to omit a presumption of innocence instruction altogether, we simply cannot read *Dilg* for the proposition that giving a presumption of innocence instruction only during voir dire necessarily constitutes reversible error. Indeed, *Dilg* itself makes clear that the crucial question where there has been a failure to instruct on the presumption of innocence is "whether the purposes underlying the presumption of innocence instruc-

**5.** The Court in *Taylor* and *Whorton* considered state defendants' claims on direct appeal that *omission* of a presumption of innocence instruction violated their constitutional right to a fair trial. Payne, as did the defendant in *Dilg*, complains primarily about the *timing* of the presumption of innocence instruction, arguing that it was a violation of Fed.R.Crim.P. 30 to give the instruction prior to the jury's being sworn.

We have held that "a trial court's violation of Rule 30 constitutes reversible error only if it results in actual prejudice to the defendant." *United States v. Valencia*, 773 F.2d 1037, 1043 (9th Cir.1985). Here, Payne does not claim that his closing argument was somehow prejudiced

by the timing of the instructions; rather, his claim goes to whether the jury, as a substantive matter, received adequate instruction on the presumption of innocence. Because we review for plain error, Payne must not only demonstrate that the error actually prejudiced him, but that it was a "highly prejudicial" error affecting substantial rights. Thus, our assessment of whether Payne suffered actual prejudice because of the Rule 30 violation is not meaningfully distinguishable from the "totality of the circumstances" analysis undertaken by the Supreme Court in *Taylor* and *Whorton* in the constitutional context.

tion ... were served in [the] case." *Id.* at 624. We find that the purposes of the presumption of innocence instruction were adequately served in this case, thus rendering the error harmless.[6]

> [A]n instruction on the presumption of innocence performs a dual function. First, it serves as a corollary to the burden of proof instruction that unless the prosecutor proves guilt beyond a reasonable doubt the jury must acquit. "Second, 'it cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced.' "

*Dilg,* 700 F.2d at 623–24 (citing *United States v. Thaxton,* 483 F.2d 1071, 1073 (5th Cir.1973) (quoting 9 Wigmore on Evidence § 2511, at 407 (3d ed. 1940))).[7] In the present case, both functions were addressed repeatedly by other jury instructions.

■ Jury Instruction No. 1 informed the jury in part that they "must decide the case solely on the evidence before them." Instruction No. 2 instructed the jury, *inter alia,* that they "must consider each count separately and decide *whether or not the government has proved* each of the elements of [the] crime *beyond a reasonable doubt.*" (emphasis added). Instruction

No. 3 further defined "beyond a reasonable doubt" in a legally permissible manner. The instruction setting out the requisite elements of the offenses of which the defendant was ultimately convicted (No. 6) specified that *"the Government* must prove" the listed elements. (emphasis added) The two instructions dealing with the requisite findings on the timing of the alleged offense (Nos. 9 and 10) likewise refer to "beyond a reasonable doubt," and Number 10 reiterates that *"the prosecution* must prove *beyond a reasonable doubt* that the commission of the specific act constituting the offense charged in each count within the time period alleged." (emphasis added). Instruction Nos. 11 and 12 explicitly instruct the jury that their decision must be based only on the evidence, i.e., testimony and exhibits, introduced in the case. *Compare Dilg,* 700 F.2d at 627 (no instruction to the jury telling them that their conclusion must be based solely on the evidence adduced at trial); *see also, United States v. Solomon,* 856 F.2d 1572, 1576 (11th Cir.1988), (explaining that the "concern in *Dilg* stemmed in part from the trial court's failure to caution the jury to reach its conclusion solely from the evidence adduced at trial"), *cert. denied,* 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989). There are, in addition, several other references to the government's burden to prove its case beyond a reasonable doubt

---

**6.** The questions of whether the error was "harmless" and whether it amounted to "plain error" are functionally equivalent in this case. Ninth Circuit opinions have taken two different conceptual approaches to the relationship between harmless error and plain error. In *United States v. Smeaton,* 762 F.2d 796, 799 (9th Cir. 1985), the panel stated that:

> "[t]he standard of 'plain error' ... goes only to the issue of reviewability and not the issue of whether a reversal is warranted. Thus, an error unobjected to at trial may be so plain as to warrant review ... yet the error may be harmless and, therefore, not justify a reversal." Therefore, we must ... consider the likelihood that the plain error materially affected the verdict.

(citations omitted). *See also, United States v. Mouzin,* 785 F.2d 682, 693 (9th Cir.) (applying harmless error analysis to an error found to be reviewable as a plain error), *cert. denied sub nom Carvajal v. United States,* 479 U.S. 985, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986); *United States v. Plascencia–Orozco,* 768 F.2d 1074, 1076 n. 7

(9th Cir.1985) (same). Another line of cases in this circuit suggests that "where the alleged error is harmless, plain error does not exist and review is unwarranted." *United States v. Loya,* 807 F.2d 1483, 1492 (9th Cir.1987) (quoting *United States v. Jarrad,* 754 F.2d 1451, 1457 (9th Cir.1985)).

The result in this case is the same under either approach. If we apply the *Loya* approach, we would consider the harmless error analysis as part of the threshold plain error inquiry, and simply find that there was no plain error since the error was harmless and, therefore, not "highly prejudicial." If we apply the *Smeaton* approach, we would find that although failure to give the instruction arguably constituted plain error, it was harmless and therefore not reversible.

**7.** The Supreme Court likewise cited *Thaxton* and Wigmore with approval in *Taylor,* 436 U.S. at 483–86, 98 S.Ct. at 1933–35.

sprinkled among the remaining instructions.

In *United States v. DeJohn,* 638 F.2d 1048 (7th Cir.1981), the Seventh Circuit found, under similar circumstances, that the dual purposes of the presumption of innocence instruction had been served. In *DeJohn* the defendant tendered a lengthy and involved presumption of innocence instruction which the trial court rejected as overly complex. *Id.* at 1056–57. Since the defendant failed to present a simplified instruction, the court did not instruct on the presumption of innocence at all. *Id.* at 1057. On review, the Seventh Circuit noted the dual purpose of the instruction, and found that

> the district court repeatedly stated the prosecution's burden and the standard of reasonable doubt by which the jury should consider the evidence. The court defined the reasonable doubt standard and described the government's burden no less than six times in the course of instructing the jury, tying that burden specifically to the elements of the crime charged. The court also charged the jury that it should consider only the evidence developed at the trial and only for conduct alleged in the indictment.

*Id.* at 1057–58. On that basis, the court held that while it "is the better practice for the instruction to be routinely given in each case," *id.* at 1059, the charge "was sufficient to serve the salutary purposes of the presumption of innocence." *Id.* at 1058.

In this case, not only were the underlying purposes of the presumption of innocence instruction served by the instructions which were given, but the record fully supports a sense that the jury was aware of the presumption of innocence. *See United States v. Ruppel,* 666 F.2d 261, 274 (5th Cir.1982) (where the district judge charged the jury on the presumption of innocence at the beginning of the trial, referred back to these instructions at the outset of his final charge, and defense counsel referred to the presumption during closing argument,

court was "unwilling to believe that the jury retired to deliberate less than fully aware of the presumption of innocence"), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982). The trial court in the instant case repeatedly referred to the presumption of innocence in instructions to the venire during voir dire, and stressed the importance of those voir dire instructions to the venire. In contrast to *Dilg,* where the court found that the trial judge minimized the significance of the pre-voir dire instructions by "specifically [leading] the venire to believe that he would not actually instruct them on the law by which they were bound until a later time, after all the evidence had been heard," 700 F.2d at 625, the trial judge in the present case emphasized that he was providing applicable legal instructions:

> As you can see, ladies and gentleman, already in this brief span of time I've already instructed you about some legal principles that are applicable to this case. For example, that the burden of proof is on the Government to prove the charges beyond a reasonable doubt and that the defendant is presumed to be innocent. RT 60.

In addition, defense counsel not only referred to the presumption of innocence during closing argument, but reminded the jurors that the court had so instructed them. R.T. 1328. In addition, as in *DeJohn,* and as distinguished from *Taylor,* there is no suggestion that the prosecutor made improper remarks which might impinge on the jury's understanding of the burden of proof and presumption of innocence.[8] Nor were the jury instructions skeletal. *Taylor,* 436 U.S. at 487, 98 S.Ct. at 1935–36. The fact that the weight of the evidence in this case was considerable also militates in favor of a finding that the failure to instruct was harmless. Margaret presented convincing testimony about repeated episodes of sexual intercourse with the defendant, which was corroborated by the medical evidence and the testi-

---

8. Likewise, since the defendant testified, there is no danger that the lack of a presumption of innocence instruction somehow impinged on the defendant's right to remain silent and present no defense.

mony of her brother and of her subsequent foster mother.

While it would have been preferable for the court to give a presumption of innocence instruction and, indeed, the court intended to do so, the underlying purposes of that instruction were served adequately by other instructions which squarely placed the burden on the government of proving its case beyond a reasonable doubt, defined beyond a reasonable doubt, and clearly confined the scope of the evidence properly before the jury. Accordingly, we find that the failure to give the instruction did not constitute plain error.

### B. *Evidentiary Issues*

#### (1) *Margaret's Prior Sexual Conduct*

Payne asserts that the district court erred by failing to admit evidence that Margaret had been found in a trailer in a state of partial undress engaged in heavy petting with a boy. The trial court held this evidence inadmissible under Fed.R.Evid. 412, the federal "rape shield" rule, which limits the admissibility of evidence of a rape victim's past sexual behavior to three situations: when constitutionally required, when relevant and more probative than prejudicial on the source of semen or injury, and when relevant and more probative than

prejudicial on the issue of consent. We find that the district court correctly excluded evidence of the trailer incident.[9]

Payne asserts as an initial matter that Rule 412 did not, at the time of his trial, apply to the crime with which he was charged, carnal knowledge of a female under the age of 16, 18 U.S.C. § 2032. Prior to being amended in 1988, Rule 412 stated that it applied "in a criminal case in which a person is accused of rape or of assault with intent to commit rape." Payne claims that "carnal knowledge" did not come within the literal terms of the rule during the relevant time, and that Congress's subsequent amendment substituting "Sex Offense" for "Rape" and "an offense under chapter 109A of title 18, United States Code" for "rape or of assault with intent to commit rape" supports his narrow reading of the rule. We need not reach the question of the applicability of Rule 412 because we find that the excluded evidence also properly could have been excluded under Rules 402 and 403; the excluded trailer incident evidence was irrelevant to some of the assertions made by the defendant, and its probative value as to the remaining assertions was minimal in comparison to its potential for prejudice.[10]

Payne contends that the evidence was admissible 1) to show Margaret's motiva-

**9.** Payne asserts that while a trial court's admission of evidence generally is reviewed for abuse of discretion, *United States v. Gillespie,* 852 F.2d 475, 479 (9th Cir.1988), since he alleges violation of his confrontation rights, we review the issue *de novo. United States v. Jenkins,* 884 F.2d 433, 435 (9th Cir.), *cert. denied,* 493 U.S. 1005, 110 S.Ct. 568, 107 L.Ed.2d 562 (1989). Because we would affirm the district court's ruling on this issue under either standard of review, we need not decide which standard applies.

**10.** At the time of Payne's indictment, the offense of "carnal knowledge of female under 16," 18 U.S.C. § 2032, was one of two offenses listed under chapter 99 of title 18, United States Code. Chapter 99 was entitled "Rape." Thus, although the charged offense did not itself include the term "rape," it arguably came within the terms of Rule 412, since it was a subset of a broader chapter covering federal rape crimes. We note that the Eighth Circuit has applied Rule 412 in carnal knowledge cases on several occasions without comment. *United States v. Azure,* 845 F.2d 1503, 1505 (8th Cir.1988); *United States v.*

*Shaw,* 824 F.2d 601 (8th Cir.1987), *cert. denied* 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988). *See also,* Wright & Graham: Evidence § 5383 (rejecting a narrow reading of Rule 412 which would make it inapplicable to prosecutions for statutory rape, and stating that "it seems reasonable to suppose that Congress did not mean the word 'rape' in Rule 412 to have any technical meaning but rather that it should be given a commonsense meaning in accordance with the underlying policy of the rule"). However, the legislative history of the 1988 amendment suggests that Rule 412 may not have applied to "carnal knowledge" during the relevant period. H.R.Rep. No. 169, 100th Cong., 1st Sess., at 19 and n. 54 (1987), *reprinted in* 1988 U.S.Code Cong. & Admin.News at 5937 (stating that "[t]his amendment will, in one sense, broaden the applicability of Rule 412 because the sex offenses set forth in 18 U.S.C. ch. 109A proscribe more conduct than the offenses of 'rape' and 'assault with intent to rape'" and citing in a footnote to 18 U.S.C. § 2031 as "rape" and 18 U.S.C. § 113 as "assault with intent to commit rape").

tion to testify falsely against Payne based on discipline arising out of the trailer incident; 2) to demonstrate Margaret's lack of credibility because of her allegedly inconsistent recounting of the incident; 3) to explain the medical evidence regarding the condition of Margaret's hymen; and 4) to rebut testimony suggesting that Margaret was a virgin. Payne asserts constitutional rights to question Margaret as to this incident—a Sixth Amendment right to confront and cross-examine witnesses and a Fifth Amendment right to a fair trial. Payne also asserts that, to the extent it explains the medical evidence, the trailer incident came under the "injury" exception to Rule 412. Since we do not rely on the applicability of Rule 412, we need not address the latter argument.

■ The right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias or self-interest in testifying. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1973); *Hughes v. Raines,* 641 F.2d 790, 792 (9th Cir.1981). The right is not unlimited, however, and a trial judge retains wide discretion in limiting the scope of cross-examination. *Delaware v. Van Arsdall,* 475 U.S. 673, 674, 106 S.Ct. 1431, 1432–33, 89 L.Ed.2d 674 (1986); *Hughes,* 641 F.2d at 792; *Chipman v. Mercer,* 628 F.2d 528, 531 (9th Cir.1980). In determining whether there has been a confrontation clause violation, this court will examine the probative value of the proposed cross-examination. *Id.* We find that evidence of the trailer incident is minimally (if at all) probative of Payne's claim of bias. Margaret's first reporting that Payne had molested her occurred more than seven months after the trailer incident and resulting discipline, and almost as long after Margaret had left the Paynes' home. Moreover, to the extent that the trailer incident had probative value on the question of Margaret's bias, that value was protected by the trial court's permitting Payne to conduct a "sanitized cross-examination" about the trailer incident, which apprised the jury that Margaret had been disciplined by Payne as a result of the incident, but did not reveal the nature of the incident. The underlying facts of the incident simply were not relevant to Margaret's purported motivation to fabricate the charges. Thus, the trial court did not abuse its discretion in excluding the evidence and the exclusion did not violate the confrontation clause.

■ We likewise find that the alleged inconsistencies in Margaret's account of the trailer incident were minor and of minimal probative value. Assuming that the inconsistencies existed and were intentional, they do not demonstrate any specific bias against Payne, but go only to Margaret's general credibility. We have found in the past that a trial court's limitation of cross-examination on an unrelated prior incident, where its purpose is to attack the general credibility of the witness, does not rise to the level of a constitutional violation of the defendant's confrontation rights. *See Hughes,* 641 F.2d at 793. In this instance, Margaret never denied the trailer incident, but gave inconsistent reports as to which items of her clothing had been removed. We find that the probative value of minor inconsistencies regarding an obviously embarrassing situation is virtually nil and does not outweigh the prejudicial effect of introducing Margaret's collateral sexual conduct. Thus, it was not an abuse of discretion to exclude the details of the trailer incident as it related to Margaret's general credibility.

■ Payne's argument that the incident was admissible to explain the medical evidence also fails because the incident is more prejudicial than it is probative of that issue. Payne failed to establish any likelihood that the activity alleged to have taken place during the trailer incident could provide an alternative explanation of the medical evidence. Nobody, including Payne, alleges that Margaret engaged in sexual intercourse in the trailer. Payne does suggest that digital penetration quite possibly occurred during the incident, and argues that such penetration could explain the condition of Margaret's hymen and vagina. At trial, however, Payne offered no expert testimony in support of that argument.

Dr. Meadows, Margaret's examining physician, testified that the condition of Margaret's vagina was consistent with multiple episodes of sexual intercourse. He further testified that he thought "digital manipulation could certainly tear [the] hymen, but [he] wouldn't expect it to change the size of the vaginal canal." R.T. 558. The defense expert did not testify that digital manipulation could account for the medical evidence. Thus, the trailer incident had minimal, if any, probative value as rebuttal to the medical evidence, and its exclusion was neither an abuse of discretion nor a violation of Payne's confrontation rights.

 Finally, Payne argues that the trailer incident should have been admitted to rebut the government's portrayal of Margaret as a virgin. We note as an initial matter that the government never asserted that Margaret was a virgin or made any statements regarding her sexual experience prior to her first contact with Payne. Rather, Margaret testified that the first time she had sexual intercourse with Payne, it hurt and she bled.[11] Even if this were tantamount to asserting the victim's virginity, the trailer incident is not relevant because 1) it is undisputed that no sexual intercourse took place during the trailer incident; and 2) the trailer incident occurred towards the end of Margaret's stay with the Paynes, after the first alleged act of sexual intercourse with the defendant.

We find that the trial court properly excluded from evidence the underlying facts of the trailer incident. Since it was irrelevant or only tenuously probative of the claims asserted by Payne, exclusion of the evidence was not an abuse of discretion and did not violate Payne's right to confrontation and to a fair trial.

### (2) *Margaret's Prior Consistent Statements*

 We review the trial court's admission of prior consistent statements for abuse of discretion. *United States v. Mil-*ler, 874 F.2d 1255, 1271 (9th Cir.1989). At trial Payne introduced inconsistent statements made by Margaret in various FBI interviews conducted in the course of investigating the alleged molestation. In response, the government sought to introduce consistent statements taken from the same FBI reports from which Payne had taken the inconsistent statements. The court allowed the government to introduce the victims' prior consistent statements, but gave a limiting instruction to the jury that the prior consistent statements were to be considered only on the issue of credibility and not for the truth of the matter asserted.

Rule 801(d)(1)(B) of the Federal Rules of Evidence provides that a prior statement is not excludable as hearsay, and may be offered for the truth of the matter asserted therein, when two requirements are met: 1) the declarant must testify at trial and must be subject to cross-examination concerning the statement; and 2) the statement must be consistent with the declarant's testimony and must be offered to rebut "an express or implied charge of recent fabrication or improper influence or motive." At the time of Payne's trial, the case law generally required that the prior consistent statement have been made before the motive to fabricate existed. *Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir.1986). There was, however, authority in several circuits suggesting that the "no-motive-to-fabricate" requirement did not apply when the prior consistent statement was offered only in order to rehabilitate a witness rather than as substantive evidence of the truth of the matter asserted therein. *United States v. Brennan*, 798 F.2d 581, 587–88 (2d Cir.1986); *United States v. Harris*, 761 F.2d 394, 398–400 (7th Cir.1985). The Ninth Circuit had not spoken on the issue. The district court followed the Second and Seventh Circuits, holding that the timing of the consistent statement (in relation to the "motive to fabricate") was irrelevant where the state-

---

**11.** We note that another of the alleged victims, Heather, likewise testified that she bled after the first incident of intercourse with Payne, notwithstanding the fact that she also testified to having been molested prior to her contact with Payne. Thus, testimony as to bleeding was not necessarily related to virginity and it is unlikely that the jury so perceived it.

ment was introduced only for rehabilitative purposes. The district court allowed the statements on that basis and gave an appropriate limiting instruction.

Subsequent to Payne's trial, this circuit considered the issue and rejected any distinction between consistent statements offered for substantive and rehabilitative purposes. We held that "a prior consistent statement offered for rehabilitation is either admissible under Rule 801(d)(1)(B) or it is not admissible at all." *Miller*, 874 F.2d at 1273. While we rejected the other circuits' analytic approach, we noted that their result might nevertheless be correct because we found that "[t]he [no motive to fabricate] requirement should not be applied as a rigid *per se* rule barring all such prior consistent statements under Rule 801(d)(1)(B), without regard to other surrounding circumstances that may give them significant probative value." *Id.* at 1274. Rather, we held that

> trial judges should consider motivation to fabricate as simply one of several factors to be considered in determining relevancy—albeit a very crucial factor. Thus, the trial judge must evaluate whether, in light of the potentially powerful motive to fabricate, the prior consistent statement has significant "probative force bearing on credibility apart from mere repetition."

*Id.* (citation omitted).

In the present case Payne alleges, and the district court agreed, that any motive to fabricate arose at the time Margaret first made the charges against him. Thus, the consistent statements were not made before such motive to fabricate arose. However, we find that Margaret's situation is much like that of the second witness in *Miller*, Marta York, whose consistent statements we held to have been properly admitted by the trial court. *Miller*, 874 F.2d at 1274–75. In *Miller*, we distinguished between York and another witness, "Svetlana," who made her prior consistent (exculpatory) statements to federal agents and defense attorneys under the "powerful motive" of pending criminal investigation or indictment. *Id.* at 1274. Margaret's purported "motive to fabricate," like York's (York was alleged to be angry at the defendant and to desire revenge against him for breaking off their affair) is much more speculative.[12]

In addition, because the consistent statements were drawn from the very same investigative reports from which the defendant drew the impeaching inconsistent statements, the statements had "significant probative force bearing on credibility apart from mere repetition." The consistent statements had probative force not merely because they demonstrated that Margaret had repeated certain aspects of her story, but because they placed the inconsistencies brought out by Payne in a broader context, demonstrating that the inconsistencies were a minor part of an otherwise consistent account.[13] Thus, the jury could evaluate the significance of the inconsistencies

---

**12.** Defense counsel suggested at various points in the trial that Margaret may have been angry at the Paynes or David Payne for various reasons and falsely accused him for revenge. On appeal, Payne fails to clarify what he asserts Margaret's motive to fabricate to be. He merely repeats that at trial he asserted that Margaret had fabricated the charges from the beginning and that her motive to fabricate arose at the time she made the charges.

**13.** We note that applying *Miller*'s flexible approach in this manner is consistent with our earlier cases allowing introduction of consistent statements where the opposing party has "opened the door" by introducing inconsistent statements from the same conversation. *See United States v. Stuart*, 718 F.2d 931, 934 (9th Cir.1983) (defendant "opened the door" for prior consistent statements to come in by examining the testifying agent about prior inconsistent statements made during the same interview); *United States v. Rinn*, 586 F.2d 113, 119–20 (9th Cir.1978) (where defendant opens up the subject matter of a declarant's prior statement to a law enforcement officer for the purpose of impeaching the declarant's credibility, Rule 801(d)(1) permits the Government to cross-examine the law enforcement officer with respect to other statements made by the declarant at the time), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979); *United States v. Parr–Pla*, 549 F.2d 660, 663 (9th Cir.) (defendant "opened the door to admission of the full conversation by asking" witness on direct examination "whether a declarant had made a particular statement in the course of the conversation"), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977).

within the totality of Margaret's accounts of events. Because Margaret's motive to fabricate was largely speculative, and because the consistent statements had probative value beyond mere repetition, we find that the prior consistent statements properly were admitted.

### (3) Hearsay statements

Admission of hearsay evidence is reviewed for abuse of discretion. *Miller*, 874 F.2d at 1263. If hearsay testimony is admitted erroneously, the reviewing court must determine whether the error was harmless beyond a reasonable doubt. *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir.1985).

■ Payne asserts that the trial court erroneously admitted two hearsay statements: 1) a statement by Margaret explaining how she came to be questioned about sexual abuse while she was still living at the Paynes', in which she recounted that her lawyer told her that her natural mother had alleged that Margaret was being abused at the Paynes'; and 2) a statement by Jackie Blondell regarding the circumstances under which Margaret first came forward with her allegations of sexual abuse.

At trial, the government asked Margaret: "When you were living at the Paynes' house, did anybody ever question you about whether you had been sexually molested by David Payne?" R.T. 251. The government then asked Margaret to "describe how this came about." The government asked these questions in order to explain Margaret's denial of the molestation at that time. Margaret testified that "The only thing I know is that my lawyer, Bob Hill, is calling me into his office along with Tonda and David Payne and asking me, saying that my mother had made an allegation that there's abuse in the home." R.T. 254–55. The trial court overruled Payne's hearsay objection to this testimony without explanation. Margaret then testified that she denied the sexual abuse allegations at that time because she "just couldn't admit it in front of Tonda and David." *Id.* There was no further explo-

ration of the mother's allegation or its basis.

We find that the statement properly was treated as non-hearsay because it was not introduced for the truth of the matter asserted. The statement was introduced neither to prove the truth of the matter asserted by Margaret's mother, i.e., that Margaret was in fact being abused, nor was it introduced to prove the truth of the matter asserted by the lawyer, i.e., that the mother had in fact made the allegation to the lawyer. Rather, it was introduced to show the effect on the listener, Margaret, and to explain the circumstances under which her denial of the molestation took place.

■ Jackie Blondell, Margaret's foster mother, testified at trial that Margaret's roommate Sha told her (Blondell) that Margaret revealed that she had been abused by David Payne. The defense objected to this testimony on hearsay grounds but was overruled by the court, which explained to the jury: "I am overruling this objection, but I want you to understand I'm overruling it so that the witness can explain why she did what she did after that, or to give meaning to what happened after that, not necessarily that what somebody told her was the truth." Blondell then testified that: "Sha came down and told me that Margaret was going to be very upset with her, but she felt that she had to tell me that Margaret went upstairs and told her that she had been abused by David Payne." Blondell testified that after her conversation with Sha, she went to Margaret and spoke with her, and that the next day she contacted Margaret's social worker, Ivadean Zamora.

There are several layers of potential hearsay in Blondell's testimony: Margaret's statement that David Payne had abused her, Sha's statement that Margaret had told her of the abuse, and Sha's statements regarding Margaret's reluctance to come forward. They are only hearsay, however, if they were offered for the truth of the matter asserted. The trial court instructed the jury that the statements related in Jackie Blondell's testimony were admitted so that Jackie Blondell could ex-

plain her subsequent actions, and that they were not necessarily to be taken as true. While this instruction partially may have cured the problem, particularly as to the first two matters, the better course would have been for the court to exclude any extraneous information contained in the statements—such as Payne's identity and Margaret's reluctance to report—which were not necessary for Blondell to explain the sequence of events.

However, even if the trial court abused its discretion by failing to circumscribe the testimony further, we find the admission of the statements to be harmless beyond a reasonable doubt. David Payne's identity and the fact that Margaret alleged that she had been sexually abused were not seriously in issue in the case. Margaret never identified anyone other than Payne as her molester. Moreover, since Margaret's disclosure to Sha took place the day before the incident was officially reported to the social worker, the court's erroneous admission of hearsay duplicating that report would be harmless.[14]

■ Somewhat more troublesome and potentially prejudicial is the court's admission of Sha's statements regarding Margaret's reluctance to report. That Margaret was reluctant to report had direct bearing on her credibility as a witness and on the question of fabrication, the central issue in the case. We nevertheless find, under the totality of the circumstances, that the admission of the statement was harmless beyond a reasonable doubt because Margaret's reluctance to report was brought out in a number of other ways—through her own testimony, by her prior denial of abuse while she was living at the Paynes, by her tearing up of the page in Andrew's diary, and by the fact that Sha, rather than Margaret, first disclosed the abuse. On the last point, we are confronted with a question of form rather than substance. While the court may have erred by admitting Blondell's testimony that Sha stated that

Margaret did not want her to tell, it was not hearsay to the extent Blondell simply testified that it was Sha, and not Margaret herself, who first told her of the abuse. Such testimony was not hearsay because the fact that Sha rather than Margaret did the initial reporting would not be a statement introduced for the truth of the matter asserted. The admissible portion of the testimony conveyed the same information as the inadmissible: that Margaret did not spontaneously come forward with charges against Payne.

The combination of the court's limiting instruction, the existence of significant other evidence of Margaret's reluctance to report, the official report made in close proximity to the report challenged as hearsay, and Margaret's repeated and consistent identification of Payne as the perpetrator, rendered any error in admission of the hearsay harmless beyond a reasonable doubt.

### (4) *Medical Report*

■ As a final evidentiary matter, Payne contends that the court erred by admitting into evidence a page from the medical report prepared by Dr. Hal Meadows following his examination of Margaret on March 8, 1985. He argues that it was cumulative, lacked foundation, and came within neither the business records nor the medical diagnosis exceptions to the hearsay rule. He also asserts that it was more prejudicial than probative because "Dr. Meadows had testified to everything contained in it." We need not address Payne's numerous arguments regarding the medical report because even if he is correct, we find the admission of the report to be harmless beyond a reasonable doubt.

Payne objected at trial and objects on appeal most strenuously to the opening sentence of the report, "Margaret is a 13 year old girl who is brought to us for exam by the Lassen County Welfare Departmetn (sic) after a current history of sexual mo-

14. Had the reports been farther apart in time, erroneously admitting the fact of Margaret's earlier report to Sha might have had a material effect on Margaret's credibility. Here, where the report was essentially contemporaneous with reports which are part of the record, there could be no prejudice.

lestation." However, the report (as introduced) did not name Payne as the purported abuser, and the district court specifically cautioned the jury that evidence concerning medical history contained in Dr. Meadows' testimony was not admitted for the truth of the matter asserted. In addition, as Payne himself points out, Dr. Meadows testified to everything which was contained in his report, including the purpose of his examination. We note, as well, that the page of the report which was introduced was summary in nature and fairly informal, and therefore would not tend to imbue Dr. Meadows' testimony with any greater authority than it already had. Since everything contained in the report had already been covered by Dr. Meadows' testimony, we find that its admission into evidence, even if erroneous, was harmless beyond a reasonable doubt.

## C. *Voir Dire Issues*

■ The sufficiency of voir dire questions asked by the trial court is reviewed for abuse of discretion. *United States v. Washington*, 819 F.2d 221, 223 (9th Cir. 1987). While it is an abuse of discretion to fail to ask questions reasonably sufficient to test jurors for bias or partiality, the trial court may refuse questions which are "tied to prejudice only speculatively." *United States v. Jones*, 722 F.2d 528, 529 (9th Cir.1983); *United States v. Toomey*, 764 F.2d 678 (9th Cir.1985), *cert. denied*, 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 799 (1986).

In *Jones* we recognized that there are several instances in which there is a real possibility of prejudice and a consequent need for specific voir dire questioning. One of those instances is when the case " 'involves ... matters concerning which the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact.' " 722 F.2d at 529–30 (citing *United States v. Robinson*, 475 F.2d 376, 381–82 (D.C.Cir.1973)). Where the topic sought to be explored does not relate to one of those classes, the party request-

ing specific voir dire questions bears the burden of showing that each question "is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp." *Id.* at 530 (quoting *Robinson*, 475 F.2d at 381).

Payne asserts that the district court erred by refusing to ask a number of voir dire questions he proposed, which may be grouped into three classes: (1) questions related to jurors' personal experience with child sexual abuse; (2) a question related to whether jurors would tend to view the testimony of law officers as inherently more credible than that of lay witnesses; and (3) a variety of other questions which did not relate directly to the recognized classes.

The proposed voir dire questions concerning sexual molestation, including whether the veniremembers had been victims of child sexual abuse, whether they had ever been accused of child molestation, whether they were associated with any group supporting child sexual abuse victims, and whether they had read, heard, or seen anything about child sexual abuse, clearly relate to an area about which the community harbors strong feelings. In such a case we review the trial court's refusal to ask the proffered questions for abuse of discretion. *United States v. Toomey*, 764 F.2d at 682.

■ In an analogous case involving narcotics, we recognized that "both the defense and prosecution [were] entitled to some probing of juror bias as to narcotics specifically," but concluded that the judge's refusal to ask specific questions did not constitute an abuse of discretion where the judge asked the jurors individually and collectively whether they knew or had any reason to believe that it would be difficult for them to be fair and impartial, and the record revealed candid responses by the jurors which disclosed prior criminal and narcotics involvements and pro-law enforcement bias. *Toomey*, 764 F.2d at 682–83. In the present case, the judge likewise asked broader questions which elicited the information sought by the defense related to sexual abuse. The judge asked whether any of the jurors or their family members had been victims of crime. In response to

this, seven prospective jurors indicated experience with molestation, as well as giving information about other crimes. R.T. 71 (daughter molested); R.T. 107 (grandaughter molested); R.T. 116 (wife molested as child); R.T. 131 (son molested at age 7); R.T. 132 (raped at age 5); R.T. 148 (daughter's roommate raped); R.T. 174 (daughter molested). The general question concerning dealings with law enforcement agencies resulted in one juror indicating that his stepson had been accused of child molestation. R.T. 165. The judge also asked whether there was "anything about the nature of the charges involving allegations of unlawful sexual intercourse with a child under the age of 16 ... which might prevent [the jurors] from being fair and impartial to either side" in the case. Although, as in *Toomey*, we note that Payne's specific questions related to child sexual abuse "might have been asked," we find that nothing in the record indicates that the judge's failure to honor Payne's requests amounted to an abuse of discretion.

■ Failure to ask jury venire members if they would be unduly influenced by the testimony of law enforcement officers does not necessarily constitute reversible error. *United States v. Powell*, 932 F.2d 1337, 1340 (9th Cir.1991); *United States v. Baldwin*, 607 F.2d 1295, 1298 (9th Cir.1979). Whether failure to ask the law enforcement question constitutes reversible error is evaluated in light of the following factors: the importance of the officer's testimony to the government's case as a whole; the extent to which the government-agent witness' credibility is challenged; the extent to which the government-agent's testimony is corroborated by non-agent witnesses; and the extent to which the question concerning the venireperson's attitude toward government agents is covered in other voir dire questions. *Id.; see also United States v. Contreras–Castro*, 825 F.2d 185, 187 (9th Cir.1987).

In *Contreras–Castro* we reversed the defendant's conviction because the government's entire case rested on the testimony of government agents, only one agent's testimony bore on a key issue which was contradicted by the defendant, and there were no non-agent witnesses for the government. *Id.* at 187. In the present case, the government did not rely on the direct testimony of government agents at all; rather, they questioned the agent regarding Margaret's consistent statements only after Payne put the agent on the stand to introduce inconsistencies. Any testimony of the agent in support of the government's case was corroborated by Margaret's own testimony and, on some issues, by medical evidence and the testimony of other witnesses. Moreover, as in *Powell*, 932 F.2d at 1341 n. 3, the district court gave an express instruction to the jury on weighing the testimony of all witnesses equally and, to an even greater extent than was done in *Powell*, the trial court asked the venire questions regarding friends and relatives in law enforcement. *Id.* at 1340–41 (judge asked "several veniremembers whether they or close friends or family had been victims or accused of crimes or whether they were related to law enforcement officials"). In light of the relatively minor role of law enforcement testimony in the government's case, the existence of corroborating evidence by non-agents, the instruction given to the jury, and the related questions posed to the veniremembers, we find no abuse of discretion by the court in refusing to ask the proposed voir dire question regarding testimony by law enforcement agents. *See Powell*, 932 F.2d at 1340–41.

■ We likewise find no abuse of discretion in the district court's failure to ask the numerous other proposed questions on such issues as military service, foster care, child care, child development, medical or nursing training, and child custody disputes. Those questions do not fall within one of the three recognized classes raising a real possibility of bias and are only speculatively related to bias. "It is wholly within the judge's discretion to reject supplemental questions proposed by counsel if the voir dire is otherwise reasonably sufficient to test the jury for bias or partiality." *Powell*, 932 F.2d at 1340. In this case, the voir dire was otherwise reasonably suffi-

cient and the district court's rejection of the supplemental questions was therefore within its discretion.

## D. *Recusal and Judicial Misconduct*

■ Prior to trial Payne filed a motion to recuse the district court judge based on the judge's prior service on the Attorney General's Commission on Pornography. Payne argued that the judge's service on the Commission created the appearance of partiality requiring recusal pursuant to 28 U.S.C. § 455(a). We review a district judge's denial of a motion for recusal for abuse of discretion. *United States v. Branco,* 798 F.2d 1302, 1304 (9th Cir.1986). Payne also asserts on appeal that the district court judge's conduct during the case was improper and, specifically, that the district court attacked defense counsel both in and out of the jury's presence in a manner exceeding the proper role of the court. A trial judge's comments during the course of a trial giving rise to charges of advocacy or partiality are likewise reviewed for abuse of discretion. *United States v. Greene,* 698 F.2d 1364, 1374–75 (9th Cir.1983).

Title 28 of the United States Code, § 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The test for disqualification under § 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. *United States v. Nelson,* 718 F.2d 315 (9th Cir.1983); *United States v. Conforte,* 624 F.2d 869, 881 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

The district judge served as a member of the Attorney General's Commission on Pornography from 1985 until it issued its report in July of 1986, prior to the commencement of Payne's trial. We find the connection between the judge's service on the Commission and the matters at issue in this case too attenuated to create an appearance of bias. The Commission in no way focused on this particular case or even on the type of conduct charged in the case. Nothing that occurred during the course of the trial demonstrated that any of the trial court's decisions were based upon, or colored by, the judge's service on the Commission. The only point in the trial where the subject of pornography came up, and the judge arguably brought to bear "extrajudicial knowledge" about pornography, he did so in an attempt to avoid prejudice to the defense.[15]

While the Commission's report expressed a view that there was an "inseparable relationship between child pornography and child abuse," applauded the fact that "sexual abuse of children is being taken increasingly seriously in this country," and "support[ed] further efforts, in public education, in the education of children, and in law enforcement, to continue to attempt to diminish the sexual abuse of children," its focus was on pornography and only tangentially on child sexual abuse. Moreover, courts have rejected the notion that such generalized policy views necessitate recusal as a matter of course. Courts have likewise held that expertise on and exposure to a subject, such as Payne alleges the judge had by virtue of his service on the Commission, does not necessitate recusal. *See Laird v. Tatum,* 409 U.S. 824, 835, 93 S.Ct. 7, 13–14, 34 L.Ed.2d 50 (1972) (mem. op. by Rehnquist, J.) ("Proof that a Justice's mind was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."); *Southern Pacific Communication v. AT & T,* 740 F.2d 980 (D.C.Cir.1984) ("As long as a judge is capable of refining his views ... and maintaining a completely open mind to decide the facts and apply the applicable law to the facts, personal views on law and policy do not disqualify him from hearing the case. The test may be stated in terms of whether the judge's mind is 'irrevocably closed' on the issues as

---

**15.** Defense counsel asked Andrew if he had watched "hard-core pornography" with the Paynes and the government asked related questions on re-direct. The judge was concerned about the vagueness and possible prejudice involved with the use of the term "hard-core pornography," and held a side bar on the matter but ultimately made no ruling.

they arise in the context of the specific case") (citations omitted), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1174 (D.C.Cir.1979) ("Administrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding."), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *see also Conforte,* 624 F.2d at 882 (a judge's views on legal issues may not serve as a basis for motions to disqualify).

We find that the district court did not abuse its discretion by denying the motion to recuse. A reasonable person with knowledge of all the facts would not conclude that the judge's impartiality might reasonably be questioned on the basis of his service on the Commission. In addition, after carefully reviewing the record at trial, with particular attention to the instances cited by Payne, we find no behavior by the district court rising to the level of judicial misconduct and no abuse of discretion by the trial court in any of its comments during the course of trial.

## E. *Cumulation*

■ As a final matter we must consider whether even if none of the asserted errors constitutes a basis for reversal standing alone, the cumulation of the various errors was nevertheless so prejudicial that reversal is warranted. *See United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988). We find that it was not. As Payne himself acknowledges, while a defendant is entitled to a fair trial, he is not entitled to a perfect trial, "for there are no perfect trials." *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973). In the present case the court erred but did not commit plain error by failing to instruct on the presumption of innocence after the jury was sworn. It likewise may have erred in admitting some of the hearsay testimony and the medical report. We found the impact of each of those errors separately to be harmless beyond a reasonable doubt, and, for the same reasons, we find that their cumulative effect did not deprive Payne of a fair trial.

Accordingly, we AFFIRM the conviction.