5 F.3d 540
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Guadalupe ACOSTA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jesus MARISCALES, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Luis FIERRO, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Manuel Ruiz ALVAREZ,
 Nos. 92-10259, 92-10449, 92-10260, 92-10273.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 30, 1993.
Decided Sept. 8, 1993.
As Amended Dec. 3, 1993.
 
 Appeal from the United States District Court for the District of Nevada, D.C. No. CR-90-00167-LDG; Lloyd D. George, District Judge, Presiding.
 D.Nev.
 REVERSED AND AFFIRMED.
 Before: Reavley,* Pregerson, and Fernandez, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Guadalupe Acosta, Jesus Mariscales, Luis Fierro, and Manuel Ruiz Alvarez appeal their convictions and sentences under the Sentencing Guidelines for conspiracy to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) and 846; distribution of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1); possession with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841(a)(1); distribution of heroin, in violation of 21 U.S.C. Sec. 841(a)(1); and engaging in a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848 (Ruiz Alvarez only). We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part, and reverse in part.
 
 I. BACKGROUND
 
 3
 This case results from an undercover FBI and DEA investigation of a suspected drug conspiracy, alleged to have transpired from January 1, 1990 to August 9, 1990. The evidence, viewed in the light most favorable to the government, is as follows:
 
 
 4
 On March 1, 1990, FBI Agent Brito, acting undercover, began purchasing small amounts of heroin and cocaine from Juan Rodriguez ("Rodriguez"). Their meetings, and some of the drug transactions, transpired at a restaurant owned by Rodriguez. Brito's plan was to identify Rodriguez's suppliers.
 
 
 5
 In June 1990, Brito learned that Rodriguez was dealing narcotics with Manuel Ruiz Alvarez ("Ruiz Alvarez") and Ruiz Alvarez's son, Fernando Ruiz. On June 14, 1990, Brito purchased 124.5 grams of heroin from Rodriguez's brother, Jose. Rodriguez had arranged this transaction, which formed the basis of Count 3 of the Superseding Indictment. During this transaction, Brito learned that Ruiz Alvarez was arriving soon from Mexico.
 
 
 6
 On June 16, 1990, Brito met Ruiz Alvarez for the first time at a heavyweight championship boxing match. Rodriguez and Fernando Ruiz were also present. Ruiz Alvarez told Brito that he was associated with Amado Carillo Fuentas, a narcotics dealer in Mexico. Ruiz Alvarez told Brito that he wanted to discuss the drug business further with Brito.
 
 
 7
 On June 18, 1990, Brito met with Rodriguez. Rodriguez told Brito that Ruiz Alvarez was heavily involved in the narcotics business and was a ranking member of a Mexican drug organization. Brito told Rodriguez that he was interested in purchasing a large quantity of cocaine, specifically, 100 kilograms or more. Brito also told Rodriguez that he had a truck with a hidden compartment capable of transporting the cocaine. Rodriguez indicated that Ruiz Alvarez could in fact supply such amount and that he (Rodriguez) was interested in seeing the truck.
 
 
 8
 On July 2, 1990, Brito met Rodriguez, Ruiz Alvarez, and others, to negotiate further the 100 kilogram cocaine purchase. Ruiz Alvarez indicated that such purchase was no problem. He told Brito that he had a supplier, "Cayito," in Los Angeles and that Amado Carillo Fuentas (from Mexico) also would be supplying him with 350 kilograms of cocaine in the near future. The deal was not finalized at this time, however. As a show of good faith, Ruiz Alvarez accompanied Brito to Brito's apartment, where he sold Brito one kilogram of cocaine for $24,000.[1] Rodriguez and another associate, Rodolfo Manjarez ("Manjarez"), were also present. This transaction formed the basis of Count 4 of the Superseding Indictment.
 
 
 9
 On July 7, 1990, Brito and a second undercover agent, Larry Valladolid, who was posing as Brito's "godfather" and supervisor, met with Ruiz Alvarez, Fernando Ruiz, and an individual from Tucson, Arizona, Jesus Alonzo Acevedo Canedo ("Acevedo Canedo"), at a casino restaurant in Las Vegas. During the meeting, Acevedo Canedo stated that he was the primary pilot for Amado Carillo Fuentas's organization ("the Fuentas organization"). He told the agents that Fuentas was a large drug trafficker who brought cocaine from Colombia into northern Mexico, and then, into the United States for distribution. Ruiz Alvarez stated that he, himself, was in charge in Las Vegas and could deliver any amount of cocaine that the agents wanted. He also told the agents that he was attempting to establish a cocaine distributorship in Las Vegas for the Fuentas organization. In addition, Fernando Ruiz stated that Cayito in Los Angeles had supplied the kilogram of cocaine purchased by Brito on July 2. Cayito, he said, was associated with a separate narcotics organization in Mexico.
 
 
 10
 In addition, Ruiz Alvarez stated that he had two enforcers or "shooters," who were outside of the restaurant at that moment. Ruiz Alvarez then offered to have someone killed for the agents as a show of good faith. On leaving the restaurant, Valladolid observed Ruiz Alvarez meet with defendant Luis Fierro ("Fierro") and Jesus Gonzales ("Gonzales"), who were outside the restaurant.
 
 
 11
 The next day, July 8, 1990, Brito and Valladolid attended a boxing match with Ruiz Alvarez and Fernando Ruiz, and a number of other individuals. At the match, Ruiz Alvarez again stated that Gonzales and Fierro were "shooters" in the organization, who "kill people." Ruiz Alvarez again offered to have someone killed for Brito. In addition, Ruiz Alvarez identified three of the men at the fight as members of the Acevedo Canedo family from Tucson, Arizona, who also belonged to the Fuentas organization.
 
 
 12
 After the fight, the group met at a restaurant to discuss their business relationship. Armando Acevedo Canedo stated that he was in charge of the organization in Tucson, and that Ruiz Alvarez was in charge in Las Vegas. The group discussed the potential sale of a large quantity of cocaine, but, again, no final agreement was reached.
 
 
 13
 On July 9, 1990, Brito and Valladolid met with Ruiz Alvarez, Cayito (who had flown into Las Vegas from Los Angeles the previous night), Armando Acevedo Canedo, and Manjarez. Cayito agreed to deliver 100 kilograms of cocaine to Las Vegas and stated that Ruiz Alvarez, Rodolfo Manjarez, and Brito could handle the details of delivery and payment.
 
 
 14
 Later that night, Ruiz Alvarez called Brito and offered to sell him a quantity of heroin that Cayito had in Los Angeles for $3,000 per ounce. Brito accepted the offer. Accordingly, on July 13, 1990, Brito purchased ten pieces (twenty-five grams per piece) of heroin from Ruiz Alvarez and Fernando Ruiz. This transaction formed the basis of Count 5 in the Superseding Indictment.
 
 
 15
 During this transaction, Ruiz Alvarez told Brito that he supplied cocaine to Rodriguez and that Rodriguez was distributing to Refugio Mariscales ("Cuco"), from Phoenix, Arizona. He indicated that he was going to start dealing directly with Cuco. He also commented on a vehicle that had broken down in Colorado, a reference that Brito did not understand until later. See n. 1, infra.
 
 
 16
 On July 16, 1990, Brito attended a barbecue at a home on Venice Street in Las Vegas. The house was owned by Rodriguez but then occupied by Ruiz Alvarez, Fernando Ruiz, and Luis Fierro. At the barbecue, Ruiz Alvarez told Brito that he was in charge of the Las Vegas drug organization and that Fernando Ruiz, Fierro, and another individual, Hernandez, worked for him. Brito also spoke briefly with Fierro. Fierro stated that Ruiz Alvarez had brought him to Las Vegas to put pressure on Rodriguez to repay a debt Rodriguez owed to Ruiz Alvarez.
 
 
 17
 On July 23, 1990, Brito met again with Ruiz Alvarez to discuss the 100 kilogram cocaine transaction. The two men agreed that Brito would buy two kilograms of heroin in addition to the 100 kilograms of cocaine.
 
 
 18
 While Brito continued to negotiate the 100 kilogram transaction, the FBI learned that Rodriguez and his associates were planning to make a delivery of cocaine to Iowa. On August 4, 1990, FBI surveillance agents observed defendant Guadalupe Acosta ("Acosta") and Rodriguez driving in a white Oldsmobile from Los Angeles to Las Vegas. Acosta left Rodriguez at a motel and then drove to Rodriguez's Venice Street house (where the July 16 barbecue had taken place). An hour and a half later, Acosta left the house and drove to a second house on Magnet street, which was also owned by Rodriguez. Here, Kandy Lynn Montgomery ("Montgomery"), Refugio Mariscales, and Jesus Mariscales were waiting for him.
 
 
 19
 Montgomery testified at trial that she and her husband, Jesus Mariscales, had flown to Las Vegas from Phoenix, Arizona a few days earlier to transport cocaine to Des Moines, Iowa. She stated that this was the third trip in which she had participated with Mariscales and Acosta to transport drugs.[2] When she and Jesus Mariscales had arrived in Las Vegas, Fierro had picked them up at the airport and taken them to the Venice Street house.
 
 
 20
 Refugio Mariscales had thereafter arrived at the Venice Street house with ten kilograms of cocaine. Montgomery, Refugio Mariscales, and Jesus Mariscales transported the cocaine to the Magnet Street house. There, they cut and repackaged the cocaine, increasing its quantity to fourteen kilograms. When Acosta arrived in the Oldsmobile, as surveilled by the FBI, Jesus Mariscales and Acosta placed the cocaine in a concealed compartment in the car.
 
 
 21
 Jesus Mariscales and Montgomery then left the Magnet Street house and began to drive the Oldsmobile to Des Moines, Iowa. On August 5, 1990, at the FBI's request, local police officers stopped the car in Denver, Colorado and took it to FBI headquarters to be searched for cocaine. The police told Montgomery and Jesus Mariscales, however, that they were holding the car because the registration did not match its license plates. At headquarters, the FBI found fourteen kilograms of cocaine.
 
 
 22
 Because negotiations were still ongoing in Las Vegas for the 100 kilogram cocaine transaction, however, the FBI did not want to alert Ruiz Alvarez and the others by seizing the fourteen kilograms of cocaine. Hence, Montgomery and Mariscales were simply delayed while 14 kilograms of fake cocaine, packaged to look like the seized cocaine, were put back in the hidden compartment of the Oldsmobile. The car was then returned to Montgomery and Mariscales, who did not notice the cocaine substitution. This possession later formed the basis of Count 6 of the Superseding Indictment. Back in Las Vegas, Ruiz Alvarez told Brito that the individuals transporting the 14 kilograms of cocaine had been stopped by police in Denver, but that the police had not discovered the concealed cocaine.
 
 
 23
 Meanwhile, Brito was still attempting to conclude the 100 kilogram cocaine transaction. He told Ruiz Alvarez that he would bring five million dollars in cash into Las Vegas for such transaction and would contact Ruiz Alvarez when ready. Ruiz Alvarez told Brito that he had secured the 100 kilograms of cocaine but that such cocaine was still with Cayito in Los Angeles. Manjarez told Brito that he had helped Cayito unload the cocaine in Los Angeles. Ruiz Alvarez told Brito that he would send Manjarez and Fierro to Los Angeles to bring the cocaine to Las Vegas for delivery to Brito.
 
 
 24
 On August 8, 1990, Brito met with Ruiz Alvarez in Brito's apartment to show him one million dollars in cash to be used for the 100 kilogram cocaine purchase. Over the next two days, Ruiz Alvarez, Fernando Ruiz, Manjarez, and Fierro attempted to close the deal. A dispute arose with Cayito regarding payment: Cayito wanted payment before releasing the cocaine to Brito, Brito refused. Ruiz Alvarez personally travelled to Los Angeles in Brito's truck containing the false compartment to obtain the cocaine.
 
 
 25
 On August 10, concerned that the 100 kilogram deal was coming apart, the DEA and FBI agents decided to shut down the entire undercover operation. Ruiz Alvarez and Manjarez were arrested in Los Angeles. Fierro and Fernando Ruiz were arrested at the Venice Street residence. Montgomery and Jesus Mariscales were arrested in Utah, while attempting to return to Las Vegas from Des Moines, after the Oldsmobile had been detained in Denver, Colorado.
 
 
 26
 Ruiz Alvarez, Fierro, Jesus Mariscales, Montgomery, Acosta, and Rodriguez[3] were charged with conspiracy to distribute in excess of 100 kilograms of cocaine and in excess of five kilograms of heroin, in violation of 21 U.S.C. Secs. 841(a)(1) and 846; distribution of about 124.4 grams of heroin, in violation of 21 U.S.C. Sec. 841(a)(1); distribution of about one kilogram of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1); distribution of about ten ounces of heroin, in violation of 21 U.S.C. Sec. 841(a)(1); possession with intent to distribute about fourteen kilograms of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1); and distribution of in excess of one kilogram of heroin, in violation of 21 U.S.C. Sec. 841(a)(1). In addition, Rodriguez and Ruiz Alvarez were charged with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848.
 
 
 27
 Montgomery agreed to testify for the government in an attempt to obtain leniency. Similarly, Rodriguez pled guilty to engaging in a continuing criminal enterprise and agreed to testify for the government in an attempt to obtain leniency.
 
 
 28
 At trial, Montgomery testified regarding the details of her three trips transporting cocaine to Des Moines, Iowa, including the fourteen kilogram cocaine shipment for which she and Mariscales were stopped in Denver. She also testified that she knew Ruiz Alvarez was in charge of the fourteen kilogram transaction.
 
 
 29
 Rodriguez testified that he met Ruiz Alvarez in Los Angeles in 1989. Thereafter, Ruiz Alvarez left $130,000 for Rodriguez to hold for him while he went to Mexico. The money was stolen. As a result, Rodriguez became indebted to Ruiz Alvarez. Rodriguez stated that Ruiz Alvarez forced him to sell drugs to repay the debt. Beginning in February 1990, Rodriguez transported drugs from California to Las Vegas with Ruiz Alvarez. Rodriguez testified that Ruiz Alvarez thereafter essentially took over Rodriguez's Las Vegas homes on Venice and Magnet Streets to conduct his narcotics business.
 
 II. ANALYSIS
 
 30
 A. Propriety of Jury's Conviction On Single Conspiracy And On the Substantive Counts Underlying Such Conspiracy
 
 
 31
 Acosta, Jesus Mariscales, Fierro, and Ruiz Alvarez contend that there was insufficient evidence to support their convictions for conspiracy and the underlying substantive counts of the conspiracy. Specifically, appellants argue that the government did not prove a single overall conspiracy, but instead, only proved the existence of multiple conspiracies. Hence, appellants contend that a variance resulted between the indictment and the proof at trial.
 
 
 32
 The threshold issue we must determine is whether there was sufficient evidence to convict the defendants of the single, overall, alleged conspiracy. United States v. Kenny, 645 F.2d 1323, 1335 (9th Cir.) ("we view the question of whether a single conspiracy has been proved, rather than multiple conspiracies, as essentially that of sufficiency of the evidence"), cert. denied, 452 U.S. 920 (1981). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979)). See also United States v. Adler, 879 F.2d 491, 495 (9th Cir.1989).
 
 
 33
 To establish the existence of a single conspiracy, as opposed to multiple conspiracies, we must determine whether there was " 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." United States v. Arbelaez, 719 F.2d 1453, 1457 (9th Cir.1983), cert. denied, 467 U.S. 1255 (1984) (citation omitted). This general test considers and accepts the existence of subgroups or subagreements. Arbelaez, 719 F.2d 1453, 1457 (9th Cir.1983). "The evidence need not be such that it excludes every hypothesis but that of a single conspiracy." Kenny, 645 F.2d at 1335. Instead, it is sufficient "that the evidence adequately supports a finding that a single conspiracy exists." Id.
 
 
 34
 To determine whether the evidence supports the existence of a single conspiracy, we consider several relevant areas of inquiry, including the nature of the scheme, the identity of the participants, the quality, frequency, and duration of each conspirator's transactions, and the commonality of times and goals. Arbelaez, 719 F.2d at 1458 (citations omitted).
 
 1. Nature of the Scheme
 
 35
 Acosta, Jesus Mariscales, Fierro, and Ruiz Alvarez were all involved in the business of distributing cocaine and heroin for profit. Under the overall scheme, cocaine and heroin were transported from Los Angeles to Las Vegas, and then, in some instances, to Des Moines, Iowa, for distribution to other sellers.
 
 2. Identity of the Participants
 
 36
 Ruiz Alvarez and, to a lessor extent, Rodriguez were the centers of this drug activity. Ruiz Alvarez was in charge of the narcotics operations in Las Vegas. As such, he received drugs supplied from Los Angeles for distribution in Las Vegas to Brito and Valladolid. Fernando Ruiz, Manjarez, Fierro, and members of the Canedo family from Tucson, Arizona were present at various meetings between Ruiz Alvarez and Brito, either to negotiate or to conduct the sale of narcotics. In addition, Ruiz Alvarez was in charge of the shipments of cocaine to Des Moines. As set forth above, Rodriguez, Acosta, Refugio Mariscales, Jesus Mariscales, Montgomery, and Fierro (who transported Jesus Mariscales and Montgomery from the Las Vegas airport to Rodriguez's house to prepare cocaine for shipment) were involved in these shipments.
 
 
 37
 3. Quality, Frequency, and Duration of Each Conspirator's Transactions
 
 
 38
 The evidence indicates that Acosta, Jesus Mariscales, Fierro, and Ruiz Alvarez were all significantly involved in the narcotics operation. Acosta and Jesus Mariscales were directly involved in each of the three shipments of cocaine to Des Moines, Iowa. Fierro was introduced to Brito by Ruiz Alvarez as his "enforcer" or "shooter." In addition, Fierro was present at a number of the meetings that occurred between Brito and Ruiz Alvarez. In addition, Fierro had a limited role in at least one of the three shipments to Des Moines. Finally, Ruiz Alvarez was in charge of all of the Las Vegas narcotics activities here at issue, including the three shipments of cocaine to Des Moines.
 
 4. Commonality of Time and Goals
 
 39
 Ruiz Alvarez told Brito that he was attempting to establish a narcotics operation stronghold in Las Vegas. Acosta, Jesus Mariscales, and Fierro, among others, each assisted Ruiz Alvarez in this effort through their respective roles in the narcotics operation.
 
 
 40
 Applying the teachings of Arbelaez, we are persuaded that the evidence adequately supports a finding of a single conspiracy. Accordingly, we conclude that there was no variance between the terms of the Superseding Indictment and the proof at trial.
 
 
 41
 Defendants also argue that the evidence was insufficient to support their convictions for the related substantive counts charged in the Superseding Indictment. If a defendant is guilty of a conspiracy, convictions for the substantive counts (Counts 3, 4, 5, 6, and 7) are also proper even if the underlying offenses were committed by another co-conspirator in furtherance of the conspiracy. United States v. Pinkerton, 328 U.S. 640, 645-47 (1946); United States v. Mares, 940 F.2d 455, 460 (9th Cir.1991). Because we conclude that the evidence adequately supports a finding of a single conspiracy, we also conclude that the evidence was sufficient to support the appellants' convictions of the substantive counts underlying the conspiracy.
 
 
 42
 B. District Court's Failure to Give a Unanimity Instruction Requiring Jury to Agree on a Specific Set of Facts
 
 
 43
 Acosta contends that the district court erred in failing to give a specific unanimity instruction requiring the jury to agree on a specific set of facts. Acosta did not request such an instruction at trial. When there is no objection to the jury instructions at the time of trial, we will review the court's failure to give a particular instruction for plain error. United States v. Boone, 951 F.2d 1526, 1541 (9th Cir.1991). Plain error is "highly prejudicial error affecting substantial rights." United States v. Payne, 944 F.2d 1458, 1463 (9th Cir.1991), cert. denied, 112 S.Ct. 1598 (1992).
 
 
 44
 The district court did give the jury a single general instruction that their verdict had to be unanimous. [CONFIRM AT ORAL ARGUMENT]. We have held that a specific unanimity instruction is required where there is a genuine possibility of jury confusion or that a conviction may occur as a result of different jurors concluding that defendants committed different acts. United States v. Echeverry, 719 F.2d 974, 975 (9th Cir.1983).
 
 
 45
 Acosta argues that such an instruction was required in this case because of an alleged variance between the Superseding Indictment charging a single conspiracy and the multiple conspiracies allegedly proven at trial. As discussed above, we disagree that the government proved only the existence of multiple conspiracies as opposed to a single, overall conspiracy. Hence, we conclude that the district court's failure to provide a specific unanimity instruction to the jury does not constitute plain error.
 
 
 46
 C. District Court's Failure to Instruct the Jury that an Overt Act Is a Necessary Element of Conspiracy
 
 
 47
 Acosta, Jesus Mariscales, and Ruiz Alvarez contend that the district court erred in failing to instruct the jury that an overt act is a necessary element of a drug conspiracy. We agree that the district court so erred, but conclude that such error was harmless beyond a reasonable doubt. See United States v. Garza, 980 F.2d 546, 554 (9th Cir.1992).
 
 
 48
 "Whether a jury instruction misstates elements of a statutory crime is a question of law reviewed de novo." United States v. Johnson, 956 F.2d 197, 199 (9th Cir.1992). We have recently held that proof of a conspiracy violation under 21 U.S.C. Sec. 846 requires: (1) an agreement to engage in criminal activity; (2) one or more overt acts taken in furtherance of the agreement; and (3) intent to commit the substantive crime. Garza, 980 F.2d at 554; United States v. Harrison-Philpot, 978 F.2d 1520, 1526 (9th Cir.1992), cert. denied, 113 S.Ct. 2392 (1993). The court has the duty "to instruct the jury on all the essential elements of the crime charged." Garza, 980 F.2d at 554 (citing United States v. Combs, 762 F.2d 1343, 1346 (9th Cir.1985)). Accordingly, failure to instruct on the "overt act" element is constitutional error. Harrison-Philpot, 978 F.2d at 1526.
 
 
 49
 We will consider, however, such error to be harmless " 'if no rational jury could have made [its] findings without also finding the omitted or presumed fact to be true.' " Garza, 980 F.2d at 554 (citing Martinez v. Borg, 937 F.2d 422, 425 (9th Cir.1991)).
 
 
 50
 In this case, in addition to the conspiracy conviction, the jury convicted Acosta, Jesus Mariscales, and Ruiz Alvarez of all of the substantive offenses underlying the conspiracy. These offenses include distribution of cocaine, possession with intent to distribute cocaine, and distribution of heroin. We have held that the jury's determination of guilt with respect to the substantive offenses underlying a conspiracy is the "functional equivalent" of a finding of an overt act element in the conspiracy. Accordingly, we conclude that the court's failure to instruct the jury on the overt act element of a conspiracy was harmless beyond a reasonable doubt because the jury found that an overt act was committed in furtherance of the conspiracy. See Garza, 980 F.2d at 554.
 
 
 51
 D. Sufficiency of Evidence Regarding Ruiz Alvarez's Engaging in a Continuing Criminal Enterprise
 
 
 52
 One of the elements of the continuing criminal enterprise offense is that the defendant must have organized, supervised, or managed at least five persons. United States v. Garcia, 988 F.2d 965, 968-69 (9th Cir.1993) (citing 21 U.S.C. Sec. 848(b)(2)(A)).
 
 
 53
 Ruiz Alvarez contends that there was insufficient evidence to prove that he organized, supervised, or managed at least five persons. As discussed above, the evidence is sufficient to support a criminal conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In reviewing, we must "assume that the jury resolved all ... matters in a manner which supports the verdict." United States v. Goode, 814 F.2d 1353, 1355 (9th Cir.1987).
 
 
 54
 Ruiz Alvarez stated to Brito that he was "in charge" of the effort to establish a stronghold for the Fuentas organization in Las Vegas. Fernando Ruiz, Rodriguez, Fierro, Jesus Gonzales (the second alleged "enforcer"), and Rodolfo Manjarez were also involved in narcotics activities related to this effort in Las Vegas. In fact, Ruiz Alvarez stated his intent to return to Mexico and to leave Fernando Ruiz, Fierro, and Manjarez in charge of his Las Vegas operations. Hence, a rational trier of fact could have concluded that Ruiz Alvarez supervised, managed, or organized Fernando Ruiz, Rodriguez, Fierro, Gonzales, and Manjarez.
 
 
 55
 In addition, Montgomery testified that Ruiz Alvarez was in charge of the attempted transaction involving the fourteen kilograms of cocaine, for which she and Jesus Mariscales were stopped in Denver. As set forth above, Acosta and Refugio Mariscales were also involved in this transaction. Hence, a rational trier of fact could conclude that Ruiz Alvarez supervised, managed, or organized Montgomery, Jesus Mariscales, Refugio Mariscales, and Acosta in this attempted transaction.
 
 
 56
 Finally, we note that Rodriguez testified in effect that Ruiz Alvarez was his supervisor. Specifically, Rodriguez testified that Ruiz Alvarez forced him to distribute narcotics to repay a $130,000 debt. Rodriguez further stated that Ruiz Alvarez had taken over Rodriguez's two Las Vegas homes to conduct drug-related activities. As such, a rational trier of fact could have found that Ruiz Alvarez supervised Rodriguez.
 
 
 57
 Accordingly, we conclude that the evidence was sufficient to enable a rational trier of fact to conclude that Ruiz Alvarez supervised as many as ten persons. Hence, the evidence was sufficient to convict Ruiz Alvarez for engaging in a continuing criminal enterprise.
 
 
 58
 E. Failure to Give Unanimity Instruction On Continuing Criminal Enterprise
 
 
 59
 Ruiz Alvarez contends that the district court committed reversible error in failing to instruct the jury that they must unanimously agree on the identity of the five people Ruiz Alvarez organized, supervised, or managed in the alleged continuing criminal enterprise. Ruiz Alvarez did not request such instruction at trial. Hence, we review the court's failure to give such instruction for plain error. Garcia, 988 F.2d at 969.
 
 
 60
 In United States v. Jerome, 942 F.2d 1328, 1331 (9th Cir.1991), we held that the district court committed plain error by failing to instruct the jury that jurors must unanimously agree on the identity of the individuals the defendant organized in that case. We so held because the group of persons presented to the jury included individuals who could not have been organized or managed by the defendant. Id;see also United States v. LeMaux, 994 F.2d 684, 688 (9th Cir.1993). Hence, a genuine possibility existed that jurors could have based their decision on a person who was not in fact organized or managed by the defendant. Jerome, 942 F.2d at 1331; see also Garcia, 988 F.2d at 969. In contrast, where the evidence would support a jury finding that the defendant organized, managed, or supervised all of the people who the government argued the defendant organized, managed or supervised, we have found no plain error. See, e.g., LeMaux, 994 F.2d 688-89; Garcia, 988 F.2d at 969.
 
 
 61
 Here, the government never provided the jury with a clear list of persons who allegedly had been organized, managed, or supervised by Ruiz Alvarez. Rather, the government merely argued in conclusory terms that "[Ruiz Alvarez] definitely is the operator of a continuing criminal enterprise." [R.T. VII-55] The closest the government came to actually identifying five or more supervisees was in its closing argument. The government described seven people who the jury could find were supervisees and concluded its remarks with the following confusing statement:
 
 
 62
 So, we have one, two, three, four, five, six, seven, and then these other individuals, which by [Ruiz Alvarez's] own mouth, he told Agent Brito there at the Delta Transmission Shop on the $250000 delivery, that those three people worked for him, were his words. So that element has been confirmed.
 
 
 63
 R.T. IX-84 (emphasis added). We question whether the government gave the jury an actual list of potential supervisees.
 
 
 64
 In any event, the government created confusion in its closing argument, when it asserted that proof of conspiracy was also adequate to establish a separate element of CCE, which requires that the defendant commit offenses together with five or more persons. The government stated: "So obviously, if you find him guilty of . . . the conspiracy, then you've found him guilty of the [continuing criminal enterprise with respect to the requirement that the defendant commit the offenses together with at least five persons]." R.T. IX-82.
 
 
 65
 From the government's closing argument, the jury might have concluded improperly that anyone involved in the conspiracy could be considered a person who Ruiz Alvarez managed or supervised. In fact, a number of individuals indicted in the conspiracy were not organized, supervised, or managed by Ruiz Alvarez. For example, Cayito was Ruiz Alvarez's supplier in Los Angeles. Nothing in the evidence supports a finding that Ruiz Alvarez organized, supervised, or managed Cayito. In addition, three members of the Acevedo Canedo family in Tuscon, Arizona were indicted in the conspiracy. But again, nothing in the evidence supports a finding that Ruiz Alvarez organized, supervised or managed these persons. Nowhere did the goveernment clarify that some of the members of the consiracy could not, as a matter of law, be considered supervisees.
 
 
 66
 Especially in light of the government's confusing statements on the significance of a finding of conspiracy, there was a "genuine possibility of juror confusion[.]" It was "possible that some jurors [would] convict on the basis of one set of facts while others [would] convict on the basis of another set of facts." See Jerome, 942 F.2d at 1331 (vacating the CCE conviction where the district court failed to give a specific unanimity instruction, even though the prosecution named people who could not have been organized or supervised by the defendant); cf. United States v. Garcia, 988 F.2d 965, 969 (finding no possibility that the jury could have based its verdict on a person who was not supervised by the defendant). Because the jurors might have based their decision to convict Ruiz Alvarez on the CCE count on a person who was not managed or supervised by Ruiz Alvarez, see Jerome, 942 F.2d at 1331, we conclude that the court committed plain error by failing to give the jury a specific unanimity instruction.
 
 
 67
 F. Cross-Examination of Witness Juan Rodriguez
 
 
 68
 Ruiz Alvarez contends that his Sixth Amendment right to confront adverse witnesses was violated because the district court limited his cross-examination of Rodriguez. Specifically, Ruiz Alvarez argues that the court prevented defense counsel from demonstrating the most important point of his cross-examination: that the government's main cooperating witness, Rodriguez, was not in fact guilty of the crimes to which he previously pled guilty. Hence, Rodriguez's credibility would be impeached.
 
 
 69
 We review a district court's decision regarding the scope of the cross-examination of a witness for an abuse of discretion. United States v. Dischner, 960 F.2d 870, 882 n. 12 (9th Cir.1992); United States v. Bonanno, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). However, we review de novo the question whether limitations on cross-ex are so unreasonable as to violate the Confrontation Clause. United States v. Vargas, 933 F.2d 701, 704 (9th Cir.1991). See also Payne, 944 F.2d at 1468 n. 9.
 
 
 70
 "The right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias or self-interest in testifying." Payne, 944 F.2d at 1469 (citing Davis v. Alaska, 415 U.S. 308, 316 (1973)). But this right is not absolute; rather, a trial judge retains wide discretion in limiting the scope of cross-examination. Id. (citing Delaware v. Van Arsdall, 475 U.S. 673, 674 (1986)). A court violates the Confrontation Clause if it denies the jury " 'sufficient information to appraise the biases and motivations of the witness.' " United States v. Jenkins, 884 F.2d 433, 436 (9th Cir.), cert. denied, 493 U.S. 1005 (1989) (citing United States v. McClintock, 748 F.2d 1278, 1290 (9th Cir.1984), cert. denied, 474 U.S. 822 (1985)). Finally, "[i]n determining whether there has been a confrontation clause violation, [we] will examine the probative value of the proposed cross-examination." Id.
 
 
 71
 During the cross-examination of witness Rodriguez, Ruiz Alvarez's counsel questioned Rodriguez as to his guilty plea to engaging in a continuing criminal enterprise ("CCE"). Counsel first asked Rodriguez to identify the five people who worked for him with respect to the CCE plea. Rodriguez replied that he never stated that five people worked for him; rather, he had only stated that he had been involved with five people. Counsel persisted, asking Rodriguez if he recalled that one of the elements of the CCE offense is that he be "the leader." The government objected on the grounds that this question was a misstatement of the law. The court sustained the objection and told counsel to move on. Hence, defense counsel continued, again asking Rodriguez to identify the five people who worked under him with respect to the CCE plea. Rodriguez then replied that he believed it was the people to whom he sold cocaine and named several names, including Ruiz Alvarez. Counsel then asked, "So you're saying that [Ruiz Alvarez] was one of the people who you supervised?" Rodriguez responded in the negative, stating that Ruiz Alvarez was the one who supervised him. Defense counsel persisted, several more times attempting unsuccessfully to get Rodriguez to identify at least five people who he supervised with respect to the CCE offense. The court advised counsel to move on, that he was not entitled to go over the matter repeatedly. Counsel changed the subject of his cross-examination momentarily, but then returned to the substance of Rodriguez's CCE guilty plea.
 
 
 72
 Finally, in the interest of time, the court asked defense counsel how much longer his cross-examination of Rodriguez would last, and also inquired as to the substance of any remaining questions. The court then permitted counsel to finish his cross-examination.
 
 
 73
 Out of the presence of the jury, defense counsel entered a formal objection to the trial court's restraints on his cross-examination. He did not base such objection on any alleged inability to ask particular questions; rather, he stated that, by cutting him off, the court caused him to become "flustered." Specifically, counsel stated, "I was taken out of rhythm, and I felt uncomfortable up there for the last ten minutes." In response, the court indicated that defense counsel's cross-examination had succeeded in impeaching Rodriguez and that counsel in fact had confronted Rodriguez at length.
 
 
 74
 Ruiz Alvarez has failed to demonstrate the probative value of any proposed cross-examination of Rodriguez that the court restricted. Ruiz Alvarez simply contends that because he was convicted by the jury on all counts, his counsel could not have successfully impeached Rodriguez, who was the government's primary witness.
 
 
 75
 We disagree. The court provided sufficient time to Ruiz Alvarez's counsel to confront Rodriguez as the government's witness. Again, the right to cross-examine witnesses to attack their credibility is not unrestricted, but subject to the court's discretion in limiting such questioning. Payne, 944 F.2d at 1469. Hence, we conclude that the court did not abuse its discretion in limiting defense counsel's cross-examination of Rodriguez, and, in so doing, the court did not violate the Sixth Amendment's Confrontation Clause.
 
 
 76
 G. Jury Instruction Regarding Determination of Guilt or Innocence
 
 
 77
 Ruiz Alvarez challenges the following instruction given by the district court to the jury:
 
 
 78
 You are here to determine the guilt or innocence of the defendants from the evidence in the case. You are not called upon to return a verdict as to the guilt or innocence of any other person or persons. The defendants are not on trial for any act or conduct not alleged in the Indictment.
 
 
 79
 (Emphasis added). Specifically, Ruiz Alvarez contends that such instruction places an undue, and unconstitutional, burden on him to prove his own innocence. He argues that a criminal jury need not determine "guilt or innocence." Rather, the jury need only determine whether the defendant is guilty beyond a reasonable doubt; if not, the jury must find the defendant not guilty.
 
 
 80
 Defense counsel did not object to this instruction at trial. Hence, we review such instruction for plain error. Payne, 944 F.2d at 1463. "A plain error is a highly prejudicial error affecting substantial rights." United States v. Giese, 597 F.2d 1170, 1199 (9th Cir.), cert. denied, 444 U.S. 979 (1979). In so reviewing, we must evaluate "whether the jury instructions as a whole are misleading or inadequate to guide the jury's deliberation." United States v. Joetzki, 952 F.2d 1090, 1095 (9th Cir.1992) (emphasis added). " 'A single instruction may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " United States v. Marsh, 894 F.2d 1035, 1040 (9th Cir.), cert. denied, 493 U.S. 1083 (1990) (citing United States v. Bordallo, 857 F.2d 519, 526 (9th Cir.1988)).
 
 
 81
 In addition to the above instruction, the jury was also instructed, in relevant part, as follows:
 
 
 82
 The law presumes the defendants to be innocent of a crime. The law does not require an accused to prove his innocence or to produce any evidence at all, and no inference whatsoever may be drawn from the election of an accused not to testify. The Government has the burden of proving him guilty beyond a reasonable doubt, but if it fails to do so you must acquit him.
 
 
 83
 Such instruction unequivocally states the presumption of innocence and the government's burden of proving Ruiz Alvarez's guilt. Hence, we cannot conclude that the challenged instruction, viewed in conjunction with this second instruction, constitutes plain error.
 
 
 84
 H. Denial Of Motion for Mistrial Based on Alleged Lack of Hispanics in the Jury Venire Pool
 
 
 85
 Ruiz Alvarez contends that the district court erred by denying his timely motion for mistrial, before the jury was empaneled, based on a lack of Hispanics in the jury venire pool. "We review independently and non-deferentially a challenge to the composition of grand and petit juries." United States v. Sanchez-Lopez, 879 F.2d 541, 546 (9th Cir.1989) (citation omitted).
 
 
 86
 The Sixth Amendment requires that "petit juries ... be drawn from a source fairly representative of the community." Taylor v. Louisiana, 419 U.S. 522, 538 (1975). The U.S. Supreme Court has outlined a three-part test to determine whether a jury selection process satisfies the Sixth Amendment. Duren v. Missouri, 439 U.S. 357, 364 (1979). A prima facie violation of the fair cross-section requirement is established upon showing: "(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process." Id.
 
 
 87
 Ruiz Alvarez has satisfied the first prong of the Duren test: Hispanics are members of a "distinctive and identifiable group in the community." Sanchez-Lopez, 879 F.2d at 547. Under the second prong of the test, he must show that the representation of Hispanics in venires from which juries are selected is not fair and reasonable in relation to the number of Hispanics in the community. Ruiz Alvarez has made no showing on this issue. Id. Hence, under Duren, he has failed to show a violation of his Sixth Amendment right to a fair and impartial jury. Accordingly, the district court did not err in denying his motion for mistrial on this issue.
 
 
 88
 I. Failure to Reduce Acosta's, Mariscales's and Fierro's Offense Levels For Minimal Participation
 
 
 89
 Acosta, Mariscales, and Fierro contend that the district court erred by failing to reduce their respective offense levels due to their alleged roles as minimal participants in the relevant conduct of the offense. See U.S.S.G. Sec. 3B1.2.[4] We review the issue of whether a particular defendant is a minor or minimal participant in criminal activity for clear error. United States v. Andrus, 925 F.2d 335, 337 (9th Cir.), cert. denied, 112 S.Ct. 249 (1991); United States v. Sanchez-Lopez, 879 F.2d 541, 557 (9th Cir.1989); United States v. Gillock, 886 F.2d 220, 222 (9th Cir.1989).
 
 
 90
 Application Note # 1 of the Commentary to 3B1.2(a) states:
 
 
 91
 1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.
 
 
 92
 Downward adjustments for minimal participation are to be used infrequently, however. Gillock, 886 F.2d at 222. Indeed, we have consistently held that defendants are not automatically entitled to such status merely because the court finds them to be less culpable. See, e.g., United States v. Molina, 934 F.2d 1440, 1452 (9th Cir.1991). We address each defendant in turn.
 
 1. Acosta
 
 93
 Acosta was involved, together with Montgomery, Jesus Mariscales, and Rodriguez, in the three shipments of cocaine from Las Vegas to Des Moines. Specifically, Montgomery and Jesus Mariscales transported the cocaine to Des Moines and Acosta then delivered it to the actual distributors in Iowa. Acosta was also responsible for collecting payments for this cocaine and returning such payment to Las Vegas. In addition, Acosta was the registered owner of the car that broke down and was abandoned in Colorado on the second trip transporting cocaine to Des Moines.
 
 
 94
 Before sentencing, the government stipulated with Acosta that the 100 kilograms of cocaine should not be included in the calculation of Acosta's base offense level under the Sentencing Guidelines. Such stipulation was based on the fact that Acosta was not involved in the negotiations of the 100 kilogram cocaine purchase, and served to reduce Acosta's base offense level by two points. The court accepted the stipulation, but indicated that it was being very lenient with Acosta by not sentencing him for the 100 kilogram quantity of cocaine.
 
 
 95
 On appeal, Acosta contends that the district court committed clear error by failing to sentence him as a minimal participant with respect to the remaining quantities. We disagree.
 
 
 96
 Acosta was not a minimal participant as to the three shipments of cocaine to Iowa. Moreover, the court properly reduced his offense level based on his lack of involvement in the negotiations of the 100 kilogram quantity of cocaine. Hence, we conclude that the district court's failure to sentence Acosta as a minimal participant for the remaining narcotics offenses was not clear error.
 
 2. Mariscales
 
 97
 Jesus Mariscales joins in the brief filed by Acosta. However, unlike Acosta, Mariscales did not request a reduction of his base offense level under U.S.S.G. Sec. 3B1.2 at trial. The question whether a defendant is a minimal participant requires a factual determination. United States v. Sanchez, 908 F.2d 1443, 1448-49 (9th Cir.1990). Hence, where a defendant does not raise this issue at trial, we will review the court's failure to reduce his or her offense level only for plain error. See United States v. Whitten, 706 F.2d 1000, 1012 (9th Cir.1983), cert. denied, 465 U.S. 1100 (1984).
 
 
 98
 Mariscales has neither argued nor demonstrated that the district court's failure to sentence him as a minimal participant in the conspiracy was "a highly prejudicial error affecting substantial rights." United States v. Koenig, 952 F.2d 267, 272 (9th Cir.1991) (citing United States v. Lopez-Cavasos, 915 F.2d 474, 475 (9th Cir.1990)). We therefore conclude that the court's failure to sentence him as a minimal participant does not constitute plain error.
 
 3. Fierro
 
 99
 Fierro contends that the district court erred by failing to reduce his offense level by four points due to his minimal participation in the conspiracy. Specifically, Fierro argues that the court so erred because he was not involved in any of the substantive counts of the Superseding Indictment.
 
 
 100
 As set forth above, both Ruiz Alvarez and Fierro indicated to Brito that Fierro was Ruiz Alvarez's "enforcer." Ruiz Alvarez also told Brito that he intended to leave Fierro, Fernando Ruiz, and Manjarez in charge of operations in Las Vegas when Ruiz Alvarez returned to Mexico. In addition, Fierro picked up Montgomery and Jesus Mariscales from the airport and brought them to Rodriguez's Venice Street residence to prepare and transport the fourteen kilogram cocaine shipment to Iowa. Finally, Ruiz Alvarez told Brito that he would sent Fierro and Manjarez to Los Angeles to obtain the 100 kilograms of cocaine for delivery to Brito in Las Vegas.
 
 
 101
 In light of this level of participation, we conclude that the district court's failure to reduce Fierro's base offense level due to minimal participation was not clear error.
 
 
 102
 J. Failure to Reduce Ruiz Alvarez's Offense Level by Two Points For Acceptance of Responsibility
 
 
 103
 Ruiz Alvarez contends that the district court erred by failing to reduce his offense level for acceptance of responsibility under U.S.S.G. Sec. 3E1.1.[5] In so doing, the court determined, based on the evidence presented at trial, that Ruiz Alvarez was "far from accepting responsibility for his conduct." Id.
 
 
 104
 Whether or not a defendant has accepted responsibility for his crime is a factual determination subject to review for clear error. United States v. Gonzalez, 897 F.2d 1018, 1019 (9th Cir.1990).
 
 
 105
 Ruiz Alvarez contends the reduction was warranted because he pled guilty to Counts 4 and 5, distribution of one kilogram of cocaine and distribution of ten pieces of heroin, respectively. In addition, Ruiz Alvarez points to his testimony at sentencing, wherein he stated: "Your Honor, I am very sorry about this. I'm sorry for getting involved in this. That is all." [Sentencing Transcript, July 20, 1992, at 17.]
 
 
 106
 First, we note that the court accepted Ruiz Alvarez's acceptance of responsibility for Counts 4 and 5, the two counts to which he pled guilty, and adjusted his offense level for these two counts accordingly. Without more, the guilty pleas on Counts 4 and 5 do not evidence a general acceptance of responsibility for the conduct underlying the remaining counts.
 
 
 107
 It is true that the fact that Ruiz Alvarez chose to go to trial on the remaining counts does not, by itself, warrant the court's denial of an adjustment for acceptance of responsibility. See United States v. Skillman, 922 F.2d 1370, 1378 (9th Cir.1991) (defendant's silence at trial cannot provide basis for denying an adjustment for his acceptance of responsibility); United States v. Watt, 910 F.2d 587 (9th Cir.1990). However, the record does not indicate that the court based its refusal to adjust Ruiz Alvarez's offense level on his failure to plead guilty on all counts. Rather, the record reveals that the court concluded, based on all the evidence presented at trial, that Ruiz Alvarez had not accepted responsibility for the conduct underlying the counts on which he went to trial. We conclude that such conclusion is not clearly erroneous.
 
 
 108
 K. Failure to Depart Downward Due to Non-Likelihood of Recidivism
 
 
 109
 Ruiz Alvarez contends that the district court erred by failing to depart downward based on non-likelihood of recidivism under U.S.S.G. Secs. 5H1.1, 5K2.0, and 4A1.3. Specifically, he argues that his sentence to thirty years' imprisonment amounts to a life sentence and therefore is not consistent with the goals expressed in the Sentencing Guidelines.
 
 
 110
 A district court's discretionary decision not to depart downward from the guidelines is not reviewable on appeal. See, e.g., United States v. Robinson, 958 F.2d 268, 272 (9th Cir.1992) ("This court has no jurisdiction to review a sentencing court's refusal to depart downward as long as the court in fact exercised its discretion"); United States v. Morales, 898 F.2d 99, 103 (9th Cir.1990). The record reveals that the district court's decision not to depart downward on this basis was discretionary. Hence, we lack jurisdiction to review this issue on appeal.
 
 
 111
 L. District Court's Denial of Ruiz Alvarez's, Acosta's and Fierro's Motion for a Mistrial as A Result of Improper Testimony
 
 
 112
 Ruiz Alvarez, Acosta, and Fierro contend that the district court erred by denying their motions for a mistrial, made as a result of the admission of particular evidence and the hearsay testimony of a government agent. We review evidentiary rulings of the district court for abuse of discretion. United States v. Catabran, 836 F.2d 453 (9th Cir.1988) (citation omitted). We review the court's denial of a motion for a mistrial for abuse of discretion. United States v. Segal, 852 F.2d 1152, 1155 (9th Cir.1988).
 
 
 113
 During the trial, undercover agents Brito and Valladolid testified at length regarding conversations with various members of the conspiracy. Throughout such conversations, many statements were made regarding connections to the Amado Carillo Fuentas Organization. Specifically, Brito testified regarding Ruiz Alvarez's ties to the Fuentas organization and alleged involvement in several drug transactions not at issue in this case.
 
 
 114
 After Brito testified, Ruiz Alvarez moved for a mistrial. The court did not rule on the motion, but instead gave the following limiting instruction, upon which all counsel agreed:
 
 
 115
 Ladies and gentlemen of the jury, I wish to issue this limiting instruction concerning a portion of the testimony of Agent Brito about a meeting with [Ruiz Alvarez] on July 16, 1990. There is no allegation in this Indictment that any Defendant is associated with the Medellin Drug Cartel. There is no allegation in this indictment that any Defendant is associated with the seizure of 20 tons of cocaine in Somar, California. There is no allegation in this Indictment that any Defendant is associated with the distribution of marijuana with Amado Carillo Fuentas. There's no allegation in this Indictment that any Defendant has anything to do with any bribery of any Mexican official or law enforcement officer by Amado Carillo Fuentas. There's no allegation in this Indictment that any Defendant is associated with Carlos Tapia Ponce. You are therefore ordered to treat such evidence with caution and to give it such weight as you think appropriate in the totality of the circumstances and in conjunction with all of the instructions that you will be given.
 
 
 116
 At the request of Ruiz Alvarez, the court also ruled that it would not allow any future testimony regarding the Medellin Cartel or any of the other drug transactions to which Brito referred in his testimony that were not at issue in this case. Ruiz Alvarez then moved to strike Brito's testimony on these issues. The court denied the motion.
 
 
 117
 Thereafter, Special Agent Valladolid testified for the government. The government asked Valladolid about a conversation he had with Ruiz Alvarez. Valladolid answered:
 
 
 118
 Well, he said that his boss was Amado Carillo Fuentas and he was bigger than anybody, and that people talked about Caro Quintero, but that Amado Carillo Fuentas was bigger than Caro Quintero. And Caro Quintero is, of course, ... the drug dealer that killed the DEA Agent in Mexico.
 
 
 119
 In response, all counsel, including the government's counsel, objected. Ruiz Alvarez immediately moved for a mistrial. All other defendants, including Acosta and Fierro, joined in the motion. The government opposed the motion, instead requesting that the jury receive a limiting instruction. The court denied the motion for mistrial, but instructed the jury as follows:
 
 
 120
 I repeat to you that any testimony related to the killing of any agent is not involved in this case at all and must not be considered by you at all in making an assessment as to the allegations set forth in the Indictment.
 
 
 121
 The court then recessed to enable the government to advise Valladolid as to his testimony.
 
 
 122
 Shortly after his testimony resumed, Valladolid referred to drug trafficking from Mexico into the United States and drugs being obtained in Colombia. Again, all defense counsel objected. The court sustained the objections, but again refused to grant a mistrial.
 
 
 123
 Valladolid then made a reference to a "private deal" with an individual by the name of Canedo. Defense counsel objected on the grounds that such testimony related to a separate incident not at issue in this case. The court sustained the objection.
 
 
 124
 Thereafter, the government questioned Valladolid regarding Canedo's narcotics operation in Tucson, Arizona. Defense counsel again objected on the grounds that such testimony did not relate to the conspiracy alleged in this case. However, the court overruled the objection.
 
 
 125
 On appeal, Ruiz Alvarez, Acosta, and Fierro contend that the admission of the above evidence violated Rules 403 and 404(b) of the Federal Rules of Evidence. Rule 403 provides as follows:
 
 
 126
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 127
 F.R.Evid. 403. Rule 404(b) provides as follows:
 
 
 128
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....
 
 
 129
 F.R.Evid. 404(b).
 
 
 130
 Ruiz Alvarez and Fierro argue that the above testimony was so egregious as to warrant a mistrial. Specifically, Ruiz Alvarez, Acosta, and Fierro contend that the testimony related to separate incidents, "other crimes," not at issue in this case and that the probative value of such testimony was substantially outweighed by the danger of unfair prejudice. Hence, they argue that the testimony violated Rules 404(b) and 403, respectively. Fierro also contends that the testimony of the DEA agent's murder and the Medellin Cartel, in particular, was more prejudicial to him than to the other defendants because it directly relates to his alleged role as a "shooter" in the conspiracy.
 
 
 131
 With respect to the testimony by Brito and the testimony by Valladolid regarding the murder of the DEA agent, the court gave prompt and specific curative instructions to redress defense counsel's concerns. We must assume the jury followed such instructions. United States v. Aichele, 941 F.2d 761, 765 (9th Cir.1991). Hence, we conclude that the district court did not abuse its discretion in failing to declare a mistrial as a result of such testimony.
 
 
 132
 The district court did not give curative instructions as a result of Valladolid's reference to drug's being obtained from Colombia and the alleged "private deal" with Canedo. However, the court sustained defense counsel's objections based thereon and struck the testimony in question. We conclude that the district court did not abuse its discretion in denying the motions for mistrial based on such testimony.
 
 
 133
 Finally, the court overruled defense counsel's objection based on the testimony regarding Canedo's Tucson operation. This case involves an intricate narcotics distribution conspiracy. Canedo was not in fact a defendant in this case. Nonetheless, the government argued that, with respect to the conspiracy, Ruiz Alvarez was in charge of Las Vegas operations, while Canedo was in charge of Tucson operations. Given Canedo's alleged relationship to Ruiz Alvarez in the conspiracy, we agree with the district court that the probative value of the testimony regarding Canedo's Tucson operations was not substantially outweighed by its prejudicial impact. Hence, we find that the court did not abuse its discretion in denying defense counsel's motion for a mistrial based thereon.
 
 
 134
 M. Failure to Grant Motion for Mistrial Based on Alleged Improper Jury Contact
 
 
 135
 Ruiz Alvarez contends that the district court committed reversible error by denying his motion for mistrial based on extrajudicial communications between the jury and FBI agents. We review a trial court's decisions regarding jury incidents for an abuse of discretion. United States v. Soulard, 730 F.2d 1292, 1305 (9th Cir.1984). "In responding to charges of juror misconduct or bias, a trial court has the power 'to discriminate on the basis of their content, their source, and the nature of the alleged misconduct.' " Soulard, 730 F.2d at 1305 (citation omitted). Such court has "considerable discretion" in deciding whether to hold an investigative hearing on allegations of improper jury contact. Id.
 
 
 136
 On agreement of counsel, the government proffered the following information to the court, as disclosed by the FBI agents: An alternate juror had looked directly at FBI Agent Ferrin and stated, "Thank God it's Friday." Agent Ferrin smiled in return but did not otherwise respond. Secondly, in response to testimony by Rodriguez, an FBI agent exchanged glances with one of defense counsel, who rolled his eyes.
 
 
 137
 The government advised the court that the government was too close to the jury in the courtroom, but that thereafter it would attempt not to have any contact with the jury or even to look at the jurors excessively. Defense counsel offered no further objection or requests for remedial action by the court. Hence, the court resolved the matter to the satisfaction of defense counsel at trial.
 
 
 138
 Accordingly, we conclude that the district court did not abuse its discretion in denying Ruiz Alvarez's motion for mistrial based on the above extrajudicial jury contact.
 
 
 139
 We REVERSE Ruiz Alvarez's conviction for engaging in a continuing criminal enterprise (Count 1). We AFFIRM on all other counts.
 
 
 
 *
 Hon. Thomas M. Reavley, United States Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The FBI videotaped, with hidden cameras, every transaction and meeting that occurred in Brito's apartment
 
 
 [2]
 The first trip occurred in January 1990. Montgomery testified that she, Jesus Mariscales, Acosta, and Rodriguez prepared cocaine for shipment at the Magnet Street house. Then, she and Jesus Mariscales transported the cocaine in a white car to Des Moines without incident. On their arrival in Des Moines, Acosta took the car to unload the cocaine. Acosta drove the car back to Las Vegas. Montgomery and Mariscales flew back
 The second trip occurred about a month later, in February 1990. The same series of events occurred. However, on the return trip, the car broke down in Colorado and was abandoned. This was the event to which Ruiz Alvarez referred to Brito during the July 13, 1990 heroin transaction.
 
 
 [3]
 Other individuals involved in the narcotics activity discussed herein were also charged in the Superseding Indictment. However, their cases are not at issue before the court on this appeal
 4 U.S.S.G. Sec. 3B1.2 reads, in relevant part, as follows:
 Mitigating Role
 Based on the defendant's role in the offense, decrease the offense level as follows:
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 In cases falling between (a) and (b), decrease by 3 levels.
 5 U.S.S.G. Sec. 3E1.1 provides:
 Acceptance of Responsibility
 (a) If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels.
 (b) A defendant may be given consideration under this section without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of conviction at trial.
 (c) A defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right.